Filed 3/2/15  P. v. Garcia CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ESEQUIEL PAUL GARCIA et al.,<br><br>    Defendants and Appellants. | H036346<br>(Santa Clara County<br>Super. Ct. No. CC800985) |

On February 4, 2009, the Santa Clara County District Attorney filed an amended information in which Esequiel Paul Garcia, Miguel Chaidez (Miguel),[1] and Lucio Estrada (collectively defendants) were charged with the March 14, 2008, murder of Mark Achilli. (Pen. Code, § 187.)  As to Estrada, the amended information contained three allegations—(1) that in the commission of the offense Estrada personally and intentionally discharged a firearm and proximately caused the death of Achilli; (2) that Estrada intentionally murdered Achilli for financial gain within the meaning of Penal Code section 190.2, subdivision (a)(1); and (3) that Estrada intentionally killed Achilli by means of lying in wait within the meaning of Penal Code section 190.2, subdivision (a)(15).  As to Garcia, the district attorney alleged that if Garcia was not the actual killer, with the intent to kill he aided, abetted, counseled, commanded, induced,

---

[1]    To avoid confusion, we refer to Miguel Chaidez by his first name as his cousin Daniel Chaidez was a witness for the prosecution at trial.  No disrespect is intended.

solicited, requested or assisted the principal actor in the commission of the murder within the meaning of Penal Code section 190.2, subdivision (c).

A jury trial started on August 16, 2010. On October 26, 2010, the jury found the defendants guilty of first degree murder and found true the special circumstance allegations.

On November 30, 2010, the court sentenced Estrada to life in prison without the possibility of parole consecutive to 25 years to life. Estrada filed a notice of appeal the same day.

On February 2, 2011, Garcia moved for a new trial. Subsequently, on February 23, 2011, after Garcia's trial counsel declared a conflict, the court appointed new counsel to represent him.

On March 17, 2011, the court sentenced Miguel to prison for 25 years to life. On April 13, 2011, Miguel filed his notice of appeal.

On December 22, 2011, Garcia's new counsel filed a motion for a new trial, which ultimately, the court denied on May 10, 2012. On the same day, the court sentenced Garcia to life in prison without the possibility of parole; Garcia filed his notice of appeal.

The defendants raise numerous issues on appeal, which we shall outline later. In addition, Garcia has filed a petition for writ of habeas corpus, which this court ordered considered with the appeal. In his petition, Garcia contends on several grounds that trial counsel was ineffective. We have disposed of the petition by separate order filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

*Facts Adduced at the Trial*

*Physical Evidence and Eyewitness Testimony*

At approximately 11:40 a.m. on March 14, 2008, after he was told by a man that he had heard eight gunshots fired in rapid succession from a semi-automatic hand-gun, Los Gatos Police Officer Daniel Accardo approached the driveway of 18400 Overlook. As he did so a white van approached; the driver of the van said he had heard the

2

gunshots. As the officer drove into the driveway an elderly gentleman flagged down the officer and told him that there was a badly injured man near a carport.

At 18400 Overlook, Officer Accardo saw a man lying face down in a carport; the man was bleeding from multiple places and there were spent shell casings on the ground. Emergency personnel arrived and declared Achilli dead. Officer Accardo was able to identify Achilli from the driver's license the officer found in Achilli's wallet, which firefighters had collected from a pocket in Achilli's pants.

Approximately two hours after the shooting, Los Gatos Police Department Corporal Kalipona Kauweloa and other officers collected evidence from the area surrounding the shooting scene. Specifically, in various different places they found a torn photograph of Achilli, a gun cleaning cloth, a black jacket recovered on Chestnut Avenue,[2] two black gloves, a gun magazine, a black Los Angeles Dodger's baseball cap, a gun magazine with two unspent .380 cartridges, and a page of printed driving directions from Fish Canyon Road to 18400 Overlook. The officers did not locate a gun.

Los Gatos Police Officer Steve Walpole collected .380 shell casings, .380 bullet fragments, and a bullet jacket at the scene; all were recovered from near where Achilli's body had been.[3] Officer Walpole took a photograph of a bullet hole that was in a drain pipe. Officer Walpole removed a computer from unit No. 36[4] and collected a cellular telephone that had been recovered from amongst Achilli's bloody clothing. Achilli's body was removed from the scene by the coroner at 4:53 p.m.

On the day after the shooting, Los Gatos Police Officer Sam Wonnell retrieved a Lorcin .380 semi-automatic pistol with no rounds in the magazine from some ground ivy

---

[2] Testimony at trial showed that Chestnut Avenue is north of Overlook.
[3] Paramedics moved Achilli's body approximately 12 feet east of where he was originally lying.
[4] Officer Accardo established that unit No. 36 was where Achilli lived.

3

located in front of some of the residences at 18400 Overlook. The next day, close to unit No. 35, Officer Wonnell found a .380-caliber shell casing.

On March 28, 2008, Santa Clara Police Sergeant Nicolas Richards served a search warrant on Miguel's residence in Duarte, California. Sergeant Richards seized a Dell laptop computer, a copier/fax machine, a gun cleaning kit, $3,240 cash, an Airsoft gun,[5] and a rifle. In the bedroom of the residence he located identifying information for Miguel. Sergeant Richards searched a Dodge Durango registered to Jose Chaidez; a MoneyGram receipt for $2,500 was found inside.

On March 29, 2008, California Highway Patrol Officer Edward Whitfield conducted a search of Estrada's Burbank apartment. There were papers belonging to Estrada in the apartment. Officer Whitfield recovered two baggies of marijuana, a baggie of various narcotics, a book entitled "Surgical Speed Shooting," a book entitled "The Gun Digest, Book of Combat Handgunnery," and a book entitled "Hit Man A Technical Manual for Independent Contractors." In addition, Officer Whitfield found two notebooks, one purple and one gray; a black bag containing $2,000 cash; and a black baseball cap with "LA" on it, which he found hanging on a hook on the back of a door. The notebooks were marked as exhibit Nos. 92 (the purple notebook) and 93 (the gray notebook), and two pages of notes taken from exhibit No. 93 were marked as exhibit No. 91. On one of the pages inside the purple notebook the name "Chaidez" was written. In the pages of the gray notebook was a letter addressed to Estrada. One of the pages of notes taken from the gray notebook included phrases such as "surveillance," "Fast Fast Fast," "Really Fast," "military style precision," "gloves, disguise," "fake wigs," "stay calm," "calm and precise," and "shoot to kill!" Inside a black backpack, Officer Whitfield found a .45-caliber handgun and under the bed he found two different .45-caliber handguns, numerous gun magazines, and a plastic baggie containing some

---

[5] Sergeant Richards testified that the Airsoft gun was not a real firearm.

ammunition and a gun cleaning cloth. The next day Officer Whitfield searched Estrada's car and found two cellular telephones. No ammunition or .380-caliber handguns were found in the residence.

Criminalist Eric Barloewen from the Santa Clara County Crime Laboratory (the crime laboratory) examined the eight fired cartridge cases, two fired bullets, and the .380-caliber pistol. He testified that the Lorcin .380 pistol was the murder weapon. All the cartridge cases recovered from the scene were ejected from the recovered weapon. He explained that a fully loaded Lorcin pistol would be able to fire a total of eight rounds.

Crime laboratory employee Matthew Riles, an expert in examining physical evidence for latent prints, determined that there were no latent prints on the pistol. He explained, however, that if someone had worn gloves while using the pistol there would not be any prints. Riles was able to develop latent prints on the paper that contained the driving directions. Michael Valverde, a fingerprint examiner, was able to identify one of the prints as belonging to Cesar Chaidez, Miguel's brother, and two fingerprints belonging to Estrada.

An expert in DNA analysis examined the baseball cap recovered from the area close to 18400 Overlook and the right glove and black jacket. The major DNA profile for all three items was the same—Estrada. Garcia and Miguel were excluded as minor contributors. A gunshot residue expert testified that there were many particles of gunshot residue on the gloves.

On March 14, 2008, Laurie Babula lived at 18400 Overlook; she testified that 18400 Overlook Road is a complex of townhouses. At approximately 7:30 a.m. on March 14, she looked out of her bedroom window and saw a man in the parking lot dressed all in black with a black messenger bag; he was wearing a black baseball hat. When Babula left her townhouse at approximately 8:00 a.m. she saw the same man at a nearby intersection; he was looking at a newspaper. She described the man as a thin

5

Hispanic in his twenties. A couple of weeks later she identified Estrada from a photographic lineup as the man she saw on the day of the murder.

On March 14, 2008, Joe Colonna, who runs a housecleaning business, dropped off two of his cleaners, Alma Fuentes and Alva at a townhouse—unit No. 33—on Overlook between 9:25 a.m. and 10:00 a.m. While cleaning the townhouse, Fuentes saw a young man walk back and forth outside. At approximately 10:30 a.m. she went outside to wait for Colonna. While she was waiting, she saw the man she had seen earlier walk back and forth while talking in Spanish on a cellular telephone. The man was wearing black pants, a black jacket, and a black cap; she described him as a "white Latino" between "24 and 25 or 26." Fuentes saw an older man arrive in a black car; he went into a unit that was close by. When Colonna arrived sometime between 11:00 a.m. and 11:30 a.m., she went back into the townhouse she had been cleaning with Colonna. While they were inside, Fuentes heard between "five and six" gunshots. Colonna heard the gunshots; he described the sound as "like somebody unloaded the whole gun." He and Fuentes locked the townhouse and left. When Fuentes went outside she saw the man in black running away.

Colonna testified that when he came back to the complex to pick up Fuentes and Alva around 11:30 a.m., he noticed a man standing around; he thought the man looked suspicious. Colonna saw the man from approximately 20 yards away and for approximately three seconds; he made eye contact with the man. Colonna described the man as "thin and light complexion, unshaven face, black clothes, carrying a . . . black bag." He had a black hat on. The man was about 25 years old and five feet seven inches tall. As Colonna was driving up to the complex he saw another man walking across the road, but he could not describe him. This man went into a unit close to unit No. 33. In court, both Fuentes and Colonna identified Estrada as the man in black they had seen on March 14.

6

Dr. Joseph O'Hara, the Santa Clara County Medical Examiner, testified that the cause of Achilli's death was "gunshot wounds of the head and torso."

*Testimony Regarding Tessa Donnelly's Relationship with Achilli and Garcia*

Tessa Donnelly met Achilli in 2004 when she was working at Mountain Charley's as a bartender; Achilli owned the bar. Donnelly dated Achilli for approximately four years, but broke up with him in September 2007 because Achilli was seeing someone else. About the same time, Achilli sold Mountain Charley's and the 180 Restaurant to Garcia and his brother, Eric. A few weeks after she broke up with Achilli, Donnelly began dating Garcia. Garcia told Donnelly that he had recently ended his relationship with his fianceé. Within a month of their first date, Garcia told Donnelly that he cared a lot about her and saw their future together. Donnelly spent most weekends in Discovery Bay where Garcia had a house. Their relationship was sexual. Garcia said he wanted to marry Donnelly and have children together, but Donnelly told him he was moving too fast. Donnelly never told Garcia she loved him.

In early November 2007, Donnelly decided Garcia was too possessive; she stopped having sexual intercourse with him. On a few occasions, Donnelly saw Garcia drive by Achilli's residence. Around New Year's Day 2008, Donnelly lost her cellular telephone. Garcia said that he did not know what happened to the telephone; Donnelly had not given Garcia permission to take it.[6] In January 2008, Donnelly and Achilli discussed dating again, so Donnelly told Garcia she wanted to date Achilli and not him. Around the same time Garcia demoted Donnelly from bar manager at the 180 Restaurant to bartender. Donnelly testified that she hoped to remain friends with Garcia because they had to work together. In February 2008, Donnelly went on several trips with Garcia

---

[6]     On March 14, 2014, after Garcia had given the police consent to search his residence, Officer Clinton Tada located a black Dell laptop shoulder bag in which he found a blue and gray Casio cellular telephone. At trial, Donnelly identified the Casio telephone as hers.

7

because Achilli started seeing someone else. On these trips Donnelly did not have sexual intercourse with Garcia, but they did engage in "foreplay."

On March 1, 2008, Donnelly went home from the restaurant at around 1:00 a.m.; she lived only two blocks away. Donnelly let Steve Wilkins, another bartender, sleep on her couch. Garcia came to her apartment uninvited.[7] Garcia had been drinking so she let him sleep in her room, but they did not have sexual intercourse. Around 9:00 a.m., Donnelly heard voices. When she got up to check on who was there, Wilkins told her that Achilli had come to the apartment and asked if Garcia was there. Wilkins said that he told Achilli that he was. Donnelly grabbed her keys and rushed out of the apartment to go to Achilli's townhouse to tell him that nothing had happened. Donnelly could not remember if she spoke to Achilli later that day or the next day.

After the March 1 incident, Donnelly and Achilli talked and "figured it out." Donnelly told Garcia that she did not love him and that she loved Achilli and was getting back together with him; she told Garcia this two or three times. Garcia told her she was wasting her life and that Achilli was old and he was young. He asked her why she was choosing Achilli over him.

The weekend following the March 1 incident, Donnelly and Achilli went to San Francisco. They spent the night together and then drove back to Los Gatos in Achilli's black BMW. Achilli parked his car in front of Donnelly's apartment. As Donnelly and Achilli were taking suitcases out of the car, Donnelly noticed Garcia drive by. Donnelly received a text message from Garcia the "gist" of which was "What are you doing? I can't believe you're with him."[8]

After March 9, 2008, Donnelly and Achilli went to Las Vegas for three days. They spoke about marriage. The night before the murder, Achilli spent the night at

---

[7]     Wilkins confirmed that this incident happened.
[8]     This incident occurred on March 9.

Donnelly's apartment. Achilli took Donnelly to work because her car was at his townhouse. He dropped her off at her work around 11:15 a.m. Achilli was going to go home and then he had a lunch meeting.

Donnelly testified that between January 2008 and up until the time of Achilli's murder there were more than 30 telephone calls between her and Garcia. However, early in the week immediately preceding the murder Garcia called her a lot, but she did not return the calls. During March 2008, Garcia sent her dozens of text messages; in some he accused her of lying, in others he asked to see her. In other messages he demanded to know where she was and told her she needed to choose between him and Achilli.[9]

Numerous witnesses testified about the relationship between Garcia and Donnelly. Joey Battiato worked for Garcia, first at Pacific Blue Equity, a mortgage company, and then as a bartender at Mountain Charley's. Battiato had known Donnelly since high school. When he heard that Mountain Charley's and the 180 Restaurant were for sale he asked Garcia if he was interested in buying them. Achilli paid Battiato a $25,000 finder's fee and promised him $25,000 more when the final sales price was paid off.

For a couple of months Battiato and Garcia shared an apartment in Los Gatos. In January 2008, Garcia became upset that Donnelly was avoiding him. Garcia thought that Donnelly was seeing Achilli again. Garcia told Battiato that Donnelly had lied to him about being out of town when she was not. On numerous occasions Garcia asked him to check to see if Donnelly's car was parked at Achilli's townhouse. Late in February 2008, after Garcia and Donnelly took trips together to Portland and Las Vegas, Garcia thought that he and Donnelly were successfully back together. Garcia told Battiato about the

---

[9] The prosecutor asked Donnelly if she remembered receiving a whole series of text messages from Garcia. Although Donnelly could not remember most of them, they were read to the jury during Donnelly's testimony and the exhibits containing the text messages were admitted into evidence.

incident when Achilli came to Donnelly's apartment and Donnelly chased after Achilli. Garcia could not understand Donnelly's attraction to Achilli.

On March 9, 2008, Battiato saw Donnelly and Achilli together in front of her house; they were removing suitcases from Achilli's car. Garcia said, "She's busted, hah. Caught her." Garcia told Battiato that he had other people checking on Donnelly's movements. Battiato testified that at least 50 percent of the telephone conversations he had with Garcia were about Donnelly. Garcia repeatedly asked him to check on Donnelly's whereabouts. Garcia told him that he checked Donnelly's telephone for text messages from Achilli. According to Battiato, Garcia threatened Achilli; he said things such as "I know people that will take care of it" and that he would "have to send flowers to the funeral or plan his funeral . . . ." Garcia stated that they could make it look as if it was a drug deal "gone bad." Garcia threatened Battiato that if he said anything, "something bad" could happen to him or his son. Garcia's threats frightened Battiato. At one point when the comments about Achilli escalated, Battiato told Garcia "Don't do it. Don't talk to me about these things." Garcia told him that he was a "graduate of USF, VP of Hewlett Packard and Phillips, Bellarmine football coach" and that the "cops would talk to him for about five minutes and they'd be on their way." Initially, Battiato did not tell the police about Garcia's threats to Achilli because Battiato was unsure if he was an accomplice. Two days after the murder, Garcia told Battiato not to tell the police that he had driven by Achilli's house.

Francis Ogbogu, Garcia's business associate, knew that Garcia was dating Donnelly and that Donnelly had dated Achilli. Before March 6, 2008, he and Garcia had conversations about Garcia's relationship with Donnelly. At one point, Garcia told him that he would probably marry Donnelly; at another point Garcia told him that the relationship was "weird." Garcia told him about the time he spent the night at Donnelly's apartment and Achilli came to the door. Garcia thought the whole thing was strange because he was dating Donnelly. Ogbogu told Garcia to confront Donnelly.

10

On March 6, 2008, Ogbogu received a text message from Garcia, which said "She denied everything."

Kristen Rush, one of Garcia's ex-girlfriends, said that Garcia had told her that his girlfriend was seeing someone else and that he had driven by the house of the girlfriend's ex-boyfriend where he saw her car.[10] Garcia appeared "upset." This happened sometime in February. Between January 2008 and the day of Achilli's murder, Rush talked to Garcia about the "situation" with his girlfriend but it was not "a lot." However, they did talk about other incidents that had happened with his girlfriend; he told Rush that he thought his girlfriend was with the man who used to own the bar. Garcia talked to her about his girlfriend not returning his telephone calls.

Trevor Kozacek, a bartender at Mountain Charley's, told a similar tale—Garcia told him he was dating Donnelly. In the beginning the relationship was good, but then Garcia expressed concern that Donnelly was seeing Achilli. Garcia asked Kozacek to check on Donnelly's whereabouts. Garcia told him he wanted Achilli to come to the bar while Donnelly was there so he could see Donnelly's reaction.

Kristina Wilkins worked at the 180 Restaurant; she had known Donnelly since 2006. Garcia told her about his relationship with Donnelly; he said he really liked her and he could picture having children with Donnelly. Garcia appeared to be in love with Donnelly; Kristina described it as "super-infatuated." However, Donnelly "did not seem as into it as he was."

Wilkins met Garcia when Garcia took over ownership of Mountain Charley's. Again, Garcia said he was dating Donnelly and wanted to marry her. However, Garcia told Wilkins that he had gotten into a fight with Donnelly because she had lied to him. Garcia said that Donnelly's car was at Achilli's house. Garcia did not like Donnelly

---

[10]    Rush did not know the name of the girlfriend, but Garcia told her he thought his girlfriend was seeing the previous owner of Mountain Charley's.

11

seeing Achilli, and he continued to pursue her. After the incident where Achilli came to Donnelly's apartment while Garcia was there, Wilkins told Garcia to let Donnelly go. Garcia said, "It's over but it's not over, if you know what I mean." Wilkins did not know what Garcia meant.

Lorene Novoa had known Garcia since eighth grade. In October 2007, Garcia told her that he was dating Donnelly. Later, Garcia told her that he thought Donnelly was seeing someone else because she stopped having sexual intercourse with him; he thought that Donnelly was going back to her old boyfriend. Novoa told Garcia not to drive by Donnelly's apartment as it could be considered stalking.

Robert Orner, who became the manager of the 180 Restaurant in February 2008, testified that about a week before Achilli was killed, he went to Santa Cruz with Garcia, Brad Tarter, and Battiato; Garcia was distant.

Nick Lezotte, who had known Garcia since high school, stated that one night Garcia called him at 1:00 a.m. to pick him up at Mountain Charley's. Lezotte drove Garcia to an address on Meridian Avenue where Donnelly was supposed to be at a dinner party; Garcia identified a black BMW there as belonging to Achilli.

In January 2008, Nome Wynn came to Los Gatos and stayed at Battiato's apartment. Garcia was there and he talked about putting a tracking device on a vehicle. Garcia said he thought his girlfriend was lying to him and seeing an old boyfriend; Garcia described him as "an old guy." Garcia became agitated when he was unable to reach Donnelly. Garcia left the apartment three or four times that night to check on Donnelly; he asked Battiato to go as well. In early February, Wynn returned to Los Gatos to talk to Garcia about buying the bar and restaurant. Garcia and Wynn left Battiato's apartment to discuss the purchase. Garcia started talking about his problems with Donnelly. As they were on their way to have a beer, Garcia tried to reach Donnelly on the telephone, but without success. Garcia asked Wynn to drive him to Achilli's townhouse to look for a dark BMW. Garcia wanted to know if Donnelly's car was there, but they did not see

12

either car. Garcia had told Wynn that Donnelly was supposed to be at a family dinner in San Francisco, but he had concerns that Donnelly was lying to him. After they left Achilli's townhouse, Garcia told Wynn to drive by the house belonging to Donnelly's mother, but there were no cars there. When they went to a bar called Carry Nations they ran into Donnelly's brother. Garcia asked him about the family dinner in San Francisco. Donnelly's brother said, "What dinner? I've been drinking all night here." Garcia became visibly upset; he was pacing back and forth. Garcia tried to telephone Donnelly about five or six times, but the telephone went to voicemail. Garcia told Wynn that Donnelly was probably with Achilli. Wynn went with Garcia to Donnelly's apartment, where Garcia retrieved a key from under a rock and let himself in. He searched under Donnelly's bed for her make-up bag. Garcia said that if the make-up bag was not there Donnelly was probably out of town.

Garcia's friend Ali Aminigohar went to Las Vegas with Garcia, Donnelly, and another friend in February 2008. Garcia told Aminigohar that Achilli had come to Donnelly's apartment when he was there. Garcia said, "He doesn't know who he is fucking with."

Garcia contacted Amanda Freel, a licensed private investigator in January 2008. Garcia stated that he wanted his girlfriend followed because he believed she was seeing Achilli. Freel prepared a contract for her services, but Garcia never signed it.

*Daniel Chaidez's Testimony*

On December 2, 2008, pursuant to a plea agreement, Daniel Chaidez (Daniel) pleaded guilty in this case to voluntary manslaughter, vicarious arming, solicitation to commit murder, and accessory to commit murder. Daniel agreed to be sentenced to 12 years, eight months in prison. The terms of the plea agreement included the following statement: "That early in the investigation of Mark Achilli's murder, Daniel Chaidez . . . contacted the police, drove himself to the police department where he ultimately described the circumstances surrounding Mark Achilli's murder, and fully cooperated

13

with detectives. Daniel Chaidez's cooperation greatly assisted the investigation and led to the arrest of other defendants." Daniel agreed to "testify in a truthful, detailed, complete, and candid manner in any future proceedings concerning the circumstances surrounding the murder of Mark Achilli on March 14, 2008."

Daniel testified that he first met Garcia in the latter part of 2005 and he began working for Pacific Blue Equity in 2006. In October 2007, he started working for Garcia as a doorman at Mountain Charley's. Daniel barely knew Donnelly, and he did not know Achilli. In January 2008, Garcia asked him if he "knew anyone who could get rid of a problem." Daniel told him that he would "inquire." Daniel telephoned his cousin Miguel; he told Miguel that someone he knew had a problem. Miguel asked him what sort of problem and Daniel told him a person. Daniel thought he asked Miguel if he knew someone who could get rid of a problem and Miguel said he would find out and call him back. Miguel called him within a few days and Daniel told Garcia "it was possible." Garcia set a price ceiling of $10,000. Daniel talked to Miguel to find out how much it would cost; initially, Miguel said $10,000. After some haggling Miguel agreed on $9,000; Daniel told Garcia it would be $9,500—Daniel anticipated that he would have some expenses.

From March 1, 2008 to March 15, 2008, there were 43 telephone calls between Daniel and Miguel. Garcia told Daniel to go to a metroactive Web site and key in 180 Club or Mountain Charley's. Daniel found Achilli's photograph and then he told Miguel how to navigate the Web site to get Achilli's photograph.

On March 11, 2008, Garcia gave Daniel $4,000 for the murder; he told Daniel he "wanted this shit done." During February, Garcia had given Daniel a piece of paper with a street address, unit address, APN number, city, and zip code. Garcia told Daniel that Achilli drove a dark 6 series BMW, and Daniel told Miguel about the car. Garcia asked if the gun would have a silencer, but Daniel was not able to tell Garcia what sort of gun would be used. Several times, Garcia suggested that it should look as if it was a drug

14

deal "gone bad" or that drugs were involved. Garcia and Daniel discussed the fact that Garcia might be a suspect, but Garcia said that it would "just blow over." Garcia indicated that he wished the murder could have happened on Valentine's Day weekend, and that he wanted the body left at the house. Garcia said that it would be best if there were no witnesses, and if Donnelly was there she should be killed.

On March 12, 2008, Daniel wired $2,500 to Miguel. Miguel confirmed that he had received the money. Daniel spoke with Garcia on the telephone both before and after the wire transfer. Renee Kelso, a cashier at Longs Drugs, confirmed that she had prepared a MoneyGram for $2,500 on March 12, 2008, at approximately 6:15 p.m. The man who had purchased the MoneyGram provided identification, but Kelso could not recall the name.

On March 13, 2008, Garcia gave Daniel $5,500 in cash in a brown paper bag. Daniel telephoned Miguel and told him he had all the money. Later Miguel telephoned Daniel to tell him the shooter was en route.

On March 14, 2008, a few minutes before noon, Miguel called Daniel to tell him that the mission was accomplished. Daniel agreed to meet Miguel to give him the remaining $6,500. The location of the meeting changed, but eventually they met at a gas station near Highway 152 and Highway 5, where Daniel gave Miguel the remaining money. Daniel testified that he did not know why he helped Garcia arrange Achilli's murder.

Daniel spoke to the police twice after the murder, once on March 24 and once on March 27. Daniel freely admitted that he had lied to the police in the first interview. However, in the March 27 interview he told the police that he feared for his safety. Initially he again lied to the police about why he had wired money to Miguel in order to avoid incriminating Miguel. However, in this interview he told the police that Garcia wanted Achilli killed and that he had spoken to Miguel about finding someone to take care of the problem. At the end of the interview, Daniel was arrested for murder. It was

15

not until many months later that there was a negotiated settlement for Daniel to plead guilty to lesser charges in exchange for his testimony.

*Miguel's Confession*[11]

On March 28, 2008, Los Gatos Police Sergeant Matt Frisby interviewed Miguel. The police read Miguel his *Miranda*[12] rights. Miguel said that his cousin Daniel called him in February 2008 and asked him if he could arrange to have someone "taken care of." Miguel said that he understood this to mean to kill someone. Miguel said that he and Daniel agreed on a price of $9,500. Later, Daniel told Miguel how to access a Web site with a photograph of Achilli. Miguel said he found the photograph of Achilli which had a 180 logo on it. Miguel printed out the photograph and gave it to someone he knew. Miguel said he got a wire transfer of $2,500 before the murder. On March 13 he met someone and gave him $1,500 cash, the victim's photograph, and the victim's address on Overlook Drive. Miguel said he met with Daniel on March 15 and Daniel gave him $6,500 cash. Miguel said he drove back to Southern California. Miguel wrote a confession on March 28, 2008. In his confession he wrote, "I called Dan to let him know right after." Miguel told police that Daniel put a maximum price of $10,000 for the murder. Miguel said that "tak[ing] care of" someone meant killing someone.

*Examination of Computer Hard Drives and Cellular Telephones*

San Jose Police Sergeant Alan Lee, a computer forensic analysis expert, examined a forensic copy of a computer hard drive in April 2008. There were two user accounts: Paul Garcia and guest. Garcia was the registered owner of the computer. Under the login name Paul Garcia, a photograph of Achilli next to a 180 logo was placed on the computer

---

[11] Miguel's recorded confession was not played for the jury. The confession came into evidence through the testimony of Sergeant Frisby and through a redacted copy of Miguel's written confession, which made no mention of Estrada.

[12] *Miranda v. Arizona* (1966) 384 U.S. 436.

on January 7, 2008. The computer had Google searches for "Mark Achilli pictures" and for private investigators, vehicle tracking devices, and GPS tracking devices.

Sergeant Lee examined a second computer with the e-mail address of danielchaidez@pacificblueequity.com. This computer had a link to the 180 Restaurant Web site that contained Achilli's photograph. This was the same photograph that was on Garcia's computer. The person using this computer accessed the photograph on March 11, 2008.

The police obtained telephone records for Achilli, Donnelly, Garcia, Daniel, Miguel, Estrada, and a Robert Jacome.[13] According to the records, Daniel and Miguel telephoned each other repeatedly on March 14, 2008. On the morning of the murder, Miguel telephoned Estrada at 9:58 a.m., Daniel at 11:24 a.m., and again at 11:42 a.m., and Estrada again at 11:30 a.m. Estrada telephoned Miguel at 11:07 and 11:39 a.m. This call was picked up by the Los Gatos cellular tower; in addition, Estrada called Jacome at 11:38 a.m. Daniel telephoned Miguel at 11:26 a.m. and after the 11:42 a.m. telephone call from Miguel, Daniel telephoned Miguel twice within two minutes. Estrada telephoned Miguel again at 11:45 a.m. and then Miguel telephoned Daniel at 11:46 a.m. Daniel returned Miguel's telephone call within a minute. At 11:57 a.m. Miguel telephoned Estrada again. On the afternoon of the murder when Miguel telephoned Estrada at 4:08 p.m. and again at 4:14 p.m., the telephone call connected to a cellular tower in Southern California. At 4:50 p.m. Daniel telephoned Miguel; Miguel immediately returned his call.

---

[13] Robert Jacome testified at the preliminary examination in this case. He said that he drove Estrada from Southern California to Northern California on March 13, 2008, they stayed in a hotel that night. The next morning, he drove Estrada to somewhere off Highway 9. Later that morning, he received a telephone call from Estrada during which Estrada sounded panicked and told Jacome to pick him up. When Jacome saw Estrada again he was running toward Jacome's car. Estrada was wearing different clothes. Jacome did not testify at the trial.

The telephone calls between Daniel and Miguel continued on March 15, the day after the murder. Specifically, Daniel telephoned Miguel at 3:50 p.m., 4:30 p.m., and 4:40 p.m.; the telephone calls connected to a cellular tower in Gilroy. At 5:30 p.m. Daniel telephoned Miguel; the telephone call connected to a cellular tower in Hollister. A 6:00 p.m. telephone call from Daniel to Miguel connected to a cellular tower at Bell Station. Between January 4 and February 11, 2008, there had been only nine telephone calls between Daniel and Miguel, and from February 12 to March 11, 2008, there were no telephone calls between the two men. From March 11 to March 15, 2008, there were 43 telephone calls between Daniel and Miguel.

As to telephone calls between Daniel and Garcia, there were eight calls between January 1 and January 31, 2008. In February the number increased to 26, and from March 1 to March 13 there were 37 telephone calls.

*Bank Records*

The custodian of records for Bank of America reviewed Garcia's bank records. The bank requires two forms of identification for cash withdrawals. The driver's license number and social security number utilized for withdrawals belonged to Garcia. On March 13, 2008, Garcia withdrew $1,500 cash from his personal account. On February 22, 2008, Garcia withdrew $2,000 cash from the Mountain Charley's savings account and the same amount on March 13, 2008. On March 13, 2008, Garcia withdrew $2,000 cash from the 180 Restaurant account. On March 14, 2008, he withdrew $1,400 from the 180 Restaurant account. There were ATM withdrawals from the 180 Restaurant account on March 6 and March 12, 2008, totaling $4,000.

A forensic accountant reviewed Garcia's financial records from March 2007 until April 2008. There were no big cash withdrawals from Garcia's personal account during that timeframe, before he withdrew the $1,500 on March 13, 2008. The accountant confirmed the cash withdrawals of $2,000 from the Mountain Charley's account on February 22 and March 13. These were the only cash withdrawals from that account.

18

The $2,000 withdrawn from the 180 Restaurant account on March 13 was the only cash withdrawal from the account between February 21 and March 20, 2008. For March 13, 2008, from Garcia's checking account, the Mountain Charley's account, and the 180 Restaurant account, a total of $5,500 was withdrawn. As to the 180 Restaurant ATM account there were regular withdrawals approximately every six or seven days for at least the month of February in the amount of $4,000. However, as to Garcia's checking account, the Mountain Charley's account, and the180 Restaurant expense account cash withdrawals were rare.

The forensic accountant examined Daniel's bank account for the period March 2007 through July 2008. From April 2007 until April 2008, the highest opening balance was $587.34; during that period, five months had negative balances, and the largest cash withdrawal was $490.

*Garcia's Testimony*

Garcia testified in his own defense that he did not hire Daniel to arrange Achilli's murder or give him $9,500; that he had nothing to do with Achilli's murder and never asked anyone to harm him; that he had never met Estrada, Miguel or Jacome; and that although he had a relationship with Donnelly, he was not jealous of Achilli's and Donnelly's relationship.

Garcia admitted that he drove past Donnelly's apartment many times, but he explained that taking the route past her apartment to Highway 9 was quicker than taking main streets.

Garcia's explanation for the withdrawal of a large amount in cash during the week before the murder was that he was expecting a large crowd for the Saint Patrick's Day weekend and he needed to put cash into the ATM machine. Also, he had to pay the janitor, buy pizza to serve during the busy weekend, make change, give Battiato $500 to buy 10 Saint Patrick's Day tickets for a party at another restaurant, pay approximately

19

$1,000 in cash to the installer of a security system, and pay out the waitresses and bartenders for tips each night.

As to his numerous telephone calls to Daniel during the week before Achilli's murder, Garcia said that Daniel was responsible for handling the telephone calls that came in as a result of a Spanish language radio commercial that Pacific Blue Equity was running.[14]  Garcia said that he would frequently telephone Daniel to find out if any telephone calls had come in and make sure that Daniel would follow up on the telephone calls.

When he heard that Achilli had been killed, Garcia went to the police station; he consented to searches of his house and automobile.  On cross-examination Garcia admitted that during his police interview he lied to the police.

*Discussion*

***Estrada's Issues***

I. *Failure to Given an Accomplice Instruction with Regard to Miguel and Garcia*

Penal Code section 1111 provides:  "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."  Under Penal Code section 1111, "An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

In this case, the trial court instructed the jury that if they found a murder had been committed, Daniel was an accomplice as a matter of law, that the jury could not convict

---

[14]  At one point during his testimony Garcia said that during March 2008 he was in the process of closing Pacific Blue Equity; the lease on the building ended on April 1, 2008.

any of the defendants based on the testimony of an accomplice alone, and that any accomplice testimony should be viewed with caution.[15] Estrada contends that the trial court was required to give accomplice instructions regarding Garcia and Miguel.

When an accomplice is called to testify *by the prosecutor or the defendant*, the trial court has a sua sponte duty to provide cautionary instructions to the jury stating that to the extent the testimony tends to incriminate the defendant it cannot alone be used to convict but requires corroboration, and it should be viewed with caution. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569 (*Guiuan*); see *People v. Howard* (2008) 42 Cal.4th 1000, 1021-1022; *People v. Zapien* (1993) 4 Cal.4th 929, 982; CALCRIM No. 334.) The rationale for requiring the cautionary instructions is that to "the extent an accomplice testifies on behalf of the prosecution, the testimony is subject to the taint of an improper motive, i.e., that of promoting his or her own self interest by inculpating the defendant." (*Guiuan*, *supra*, at p. 568.) However, when an accomplice is a *codefendant who testifies on his or her own behalf*, different rules may apply because of the potential for prejudice to the codefendant's case. (*People v. Terry* (1970) 2 Cal.3d 362, 398-399 (*Terry*), overruled on other grounds in *People v. Carpenter* (1997) 15 Cal.4th 312, 381.)

When a codefendant/accomplice takes the stand on his or her own behalf and implicates the defendant while also *admitting his or her own guilt*, the courts have concluded that the normal rule triggering the sua sponte duty to instruct on the cautionary principles should not apply. (*Terry*, *supra*, 2 Cal.3d at p. 399.) In this circumstance, there is no potential for prejudice to the codefendant's case because he or she has effectively confessed guilt. (*Ibid.*) In contrast, the California Supreme Court has declined to impose the sua sponte duty when a testifying codefendant implicates the defendant but *denies his or her own guilt*, reasoning that this is a matter for the trial

---

[15] The court instructed the jury pursuant to CALCRIM No. 335—no dispute whether a witness is an accomplice.

21

court's discretion because the "court may properly conclude that the giving of accomplice instructions might improperly prejudice the codefendant's case." (*People v. Ramos* (1982) 30 Cal.3d 553, 581-582 (*Ramos*);[16] *Terry*, *supra*, at pp. 398-399; *People v. Catlin* (1959) 169 Cal.App.2d 247, 255 [it might subject the codefendant to unfair prejudice in the eyes of the jury to give even a limited instruction on accomplice testimony].)

In more recent cases, the California Supreme Court has concluded that even when a codefendant/accomplice testifies on his or her own behalf and denies guilt, the trial court is required to give the cautionary instructions *upon request* by a defendant, reasoning that "just as in the case of an accomplice called to testify by the prosecution, [the codefendant's] testimony was 'subject to the taint of an improper motive . . . .' " (*People v. Box* (2000) 23 Cal.4th 1153, 1209, overruled on another ground in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10; see *People v. Avila* (2006) 38 Cal.4th 491, 562.) However, our high court has not expressly overruled its earlier decisions in *Terry* and *Ramos* declining to impose a *sua sponte* duty when the testifying codefendant denies his or her guilt. (See *People v. Smith* (2005) 135 Cal.App.4th 914, 928.)

Here, Garcia testified on his own behalf and denied guilt; further, he did not in any way implicate Estrada. Accordingly, under our high court's holdings in *Terry* and *Ramos,* Estrada's contention that the trial court had a sua sponte duty to provide the cautionary instructions as to Garcia is unavailing.

As to Miguel's confession, Estrada's counsel entered into an agreement with the prosecution that Miguel's confession be redacted so as not to implicate Estrada. The redactions and limitations that the parties agreed to eliminated the need for an accomplice instruction.

---

[16] The United State Supreme Court granted certiorari and ultimately reversed the judgment of *Ramos* in *California v. Ramos* (1983) 463 U.S. 992 on other grounds.

Even if we were to assume for the sake of argument that the trial court should have sua sponte provided the cautionary instructions with regard to Miguel's testimony, the failure to do so was not prejudicial. The failure to give accomplice instructions is harmless if there is sufficient corroborating evidence in the record. (*People v. Avila*, *supra*, 38 Cal.4th at p. 562.) The corroborating evidence must tend to connect the defendant with the crime without aid or assistance from the accomplice's testimony; however, the corroborative evidence may be slight, may be entitled to little consideration when standing alone, and need not establish all the elements of the crime. (*Id.* at pp. 562-563; *People v. Williams* (2013) 56 Cal.4th 630, 678-679.) Here, there was ample corroborating evidence connecting Estrada to the crime independent of Miguel's testimony. The telephone records, the three eyewitness identifications, the items belonging to Estrada found near the crime scene, Estrada's fingerprints on the directions to Achilli's residence, gunshot residue on Estrada's gloves recovered from near the crime scene, and the cash found in the black bag recovered from Estrada's residence all connected Estrada to the crime.

Estrada argues that virtually all the evidence of premeditation or planning for the murder came from Miguel and Daniel; and there was insufficient corroboration of their testimony and statements regarding that planning or premeditation. We disagree. Three types of evidence indicate premeditation and deliberation: facts about how and what the defendant did before the killing, which indicate planning; facts about the defendant's prior relationship or conduct with the victim from which a motive to kill may be inferred; and facts about the manner of the killing from which a preconceived design may be inferred. (See *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) The fact that Estrada came from Southern California and had the directions to Achilli's residence, coupled with the eyewitness testimony that placed him at the scene well before Achilli arrived, plus the manner of the killing and location of the crime, provided ample corroborating evidence that this was a premeditated murder. The number of shots fired into Achilli

23

indicated premeditation and deliberation—that is, "the manner of killing was so particular and exacting that [Estrada] must have intentionally killed according to a 'preconceived design' to take his victim's life." (*Id*. at p. 27, italics omitted.)

Alternatively, Estrada argues that there was insufficient corroboration of the murder-for-hire special circumstance and the lying-in-wait special circumstance. Again, we disagree. The cash found in the black bag at Estrada's residence corroborated the special circumstance of murder for hire.

As to the lying-in-wait special circumstance, a person commits a murder by means of lying in wait if he or she conceals his or her purpose from the person killed, he or she waits and watches for an opportunity to act, and then from a position of advantage he or she makes a surprise attack on the person killed. (CALCRIM No. 728.) Estrada placed himself in a position where he knew that he would encounter Achilli. The fact that Estrada was seen well before the actual murder by Babula not only in the parking lot of the Overlook Road complex but also at the stop sign reading a newspaper, and by Fuentes walking back and forth in the Overlook complex while talking in Spanish on a cellular telephone, supports the inference that Estrada was waiting for an opportunity to kill Achilli. We find sufficient corroboration for both special circumstance allegations. Accordingly, we find any assumed error harmless.

II. *Alleged Error in Admitting Evidence that Three Firearms Not Used in the Murder were Found in Estrada's Residence*

Estrada contends that the trial court erroneously permitted the prosecution to introduce evidence that three firearms were found in the search of his residence. He points out that Achilli was shot with a Lorcin .380 handgun and eight .380 expended shell cases were found near the body. Further, there was no evidence of any other firearm involved in the murder or any other caliber of ammunition used.

The People counter that the record does not establish that Estrada's counsel objected to Officer Whitfield's testimony regarding the guns he found in Estrada's

24

residence. Further, Estrada's counsel cross-examined the officer and established the absence of any .380 firearms or ammunition in the residence. Accordingly, the People assert that Estrada has forfeited this issue on appeal.

The first question we must answer is whether Estrada preserved this issue for review. " ' "[Q]uestions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." ' [Citation.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)

At the end of Officer Whitfield's testimony Estrada's counsel asked the court to read a stipulation regarding items found in Estrada's residence and "note that these are being admitted over objection." The court read to the jury the following: "Ladies and Gentleman of the Jury, the books taken from Lucio Estrada's residence and the handguns taken from his residence and the note from a notepad taken from his residence are being admitted for a limited purpose. These items are only admissible if they are related to the motive, knowledge, planning or preparation of the crime, and enhancement alleged against Mr. Estrada and for no other purpose. [¶] If you determine that either the books or the note do not directly relate to the planning or preparation or the motive or knowledge or—motive or knowledge of the crime or special allegations against Lucio Estrada, you are to disregard those items of evidence. They get whatever weight you put on them. [¶] You may not consider the books or the note for the purpose of determining whether Lucio Estrada is a bad person or whether he possesses a bad character trait, or that he is predisposed to commit a crime of the type that's charged."

After the jury retired to deliberate, the court made a record of an objection that Estrada's counsel made shortly before the prosecutor's closing argument. As to the guns, Estrada's counsel stated that prior to trial he "objected to the introduction of handguns that were taken from Mr. Estrada's residence that weren't introduced into evidence. I should note that the prosecutor put a picture, during his presentation, of the handguns.

25

I didn't object to that nor did I make a motion to exclude it because it actually wasn't introduced during the prosecution's case-in-chief. [¶] However, no witness testified about how any of those handguns related to the preparation of the killing of Mark Achilli. So I think the court erred in allowing—or in the in limine ruling that the Court ruled that the guns were admissible. [¶] So I think that's—I made my objections in limine and because no witness testified about the relevance of the items that I've mentioned, other than—or no witness testified about them other than that they were found in Mr. Estrada's apartment, they shouldn't have been admitted, nor should they have been exhibited on in closing argument and that's—I think the record should be clear." The court did not disagree with counsel's recollection. Given the foregoing, we cannot agree with the People that Estrada has forfeited this issue on appeal.

" 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)[17] Generally, "[w]hen the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons. [Citations.]" (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056 [trial court erred in admitting evidence of defendant's prior possession of handgun similar to murder weapon where prosecutor did not claim such weapon was actually used in murders]; see also *People v. Riser* (1956) 47 Cal.2d 566, 577 [trial court erred in admitting evidence of a Colt .38–caliber revolver found in defendant's possession two weeks after murders where evidence showed weapon actually used was a Smith and Wesson .38–caliber revolver], overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 648-649; *People v. Archer* (2000) 82 Cal.App.4th 1380, 1392-1393 [trial court erred in admitting evidence of knives recovered

---

17      All unspecified statutory references are to the Evidence Code.

from defendant's residence two years after murder where knives were not murder weapon and were irrelevant to show planning or availability of weapons].)  In other words, "[e]vidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons—a fact of *no relevant* consequence to determination of the guilt or innocence of the defendant.  [Citations.]"  (*People v. Henderson* (1976) 58 Cal.App.3d 349, 360.)

On the other hand, evidence of weapons not actually used in the commission of a crime may be admissible when they are relevant for other purposes.  (*People v. Cox* (2003) 30 Cal.4th 916, 956 [when weapons are otherwise relevant to the crime's commission, but are not the actual murder weapon, they may still be admissible], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  The critical inquiry is whether the weapons evidence bears some relevance to the weapons shown to have been involved in the charged crimes, or is being admitted simply as character evidence.  (*People v. Barnwell*, *supra*, 41 Cal.4th at pp. 1056-1057; *People v. Prince* (2007) 40 Cal.4th 1179, 1248-1249.)

The People argue that the evidence was admissible to support the prosecution's theory that Estrada was a hired hit man and the enhancement allegation that the murder was for financial gain.  The existence of multiple firearms and ammunition supports the prosecution's theory of liability and motive for Estrada's involvement in the killing of someone unknown to him; thus, the People assert that the firearms were not introduced to show that Estrada was a violent person but to establish the nature of Estrada's employment in this case.

While it is arguable that the People are correct, the problem is that with respect to the guns the jury was *not* told that they could *not* consider the guns for the purpose of determining whether Estrada was a bad person or whether he possessed a bad character

27

trait, such as a hit man would have, or that he was predisposed to commit a crime of the type charged. The court gave this admonishment only with respect to the books and note.

Regardless, any error in admitting the evidence was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Scott* (2011) 52 Cal.4th 452, 492 [employing *Watson* analysis where evidence erroneously admitted under § 1101].)

As noted, *ante*, given the telephone records, the three eyewitness identifications that placed Estrada at the scene well before Achilli arrived, and the manner of the killing and location of the crime (miles from where Estrada lived), the items belonging to Estrada found near the crime scene, Estrada's fingerprints on the directions to Achilli's residence, gunshot residue on Estrada's gloves recovered from near the crime scene and the cash found in the black bag recovered from Estrada's residence, we conclude that any assumed error in admitting evidence concerning the guns found in Estrada's residence was harmless. That is, after an examination of the entire cause, including the evidence, this court is of the opinion that it is not reasonably probable that a result more favorable to Estrada would have been reached in the absence of the alleged error.

Estrada's attempt to elevate the asserted error to a violation of due process is unavailing. The "routine application of state evidentiary law does not implicate [a] defendant's constitutional rights." (*People v. Brown* (2003) 31 Cal.4th 518, 545.) "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. [Citations.]" (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

In determining whether an evidentiary ruling denied Estrada due process of law, we note that "the presence or absence of a state law violation is largely beside the point" because "failure to comply with the state's rules of evidence is neither a necessary nor a sufficient basis" for granting relief on federal due process grounds. (*Jammal v. Van de Kamp* (9th Cir.1991) 926 F.2d 918, 919-920.) If Estrada "demonstrates the admission of evidence violated federal due process rights, he need not demonstrate the *Watson*

28

standard for prejudicial error.  Under *Chapman v. California* (1967) 386 U.S. 18, 24 . . . ,

in the case of a deprivation of federal due process, reversal is required unless the state can

prove beyond a reasonable doubt that the error did not contribute to the verdict.

[Citations.]"  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229.)

"Only if there are *no permissible* inferences the jury may draw from the evidence

can its admission violate due process.  Even then, the evidence must 'be of such quality

as necessarily prevents a fair trial.'  [Citation.]  Only under such circumstances can it be

inferred that the jury must have used the evidence for an improper purpose."  (*Jammal v.*

*Van de Kamp*, *supra*, 926 F.2d at p. 920.)  "The dispositive issue is . . . whether the trial

court committed an error which rendered the trial 'so "arbitrary and fundamentally

unfair" that it violated federal due process.'  [Citations.]"  (*Reiger v. Christensen* (9th Cir.

1986) 789 F.2d 1425, 1430.)

Looking at the effect of the gun evidence on the trial as a whole, we believe that

the evidence was not of such quality as necessarily prevented a fair trial.  For the same

reasons as noted in our *Watson* analysis, we conclude beyond a reasonable doubt that the

error in admitting the gun evidence did not contribute to the verdict.  Due process

violations are assessed under the harmless beyond a reasonable doubt standard of

*Chapman v. California*, *supra*, 386 U.S. at page 24.  (*People v. Mena* (2012) 54 Cal.4th

146, 159.)

III. *Alleged Error in Admitting into Evidence Books Found in Estrada's Home*

When Officer Whitfield searched Estrada's residence he found three books.  One

was entitled "Surgical Speed Shooting," another "The Gun Digest, Book of

Handgunnery," and a third, "Hit Man."  As explained, *ante* in section II, Estrada's

counsel objected to this evidence and asked the court to read the stipulation concerning

the evidence.  Specifically, as to the books, the court told the jury they were "being

admitted for a limited purpose.  These items are only admissible if they are related to the

29

motive, knowledge, planning, or preparation of the crime, and enhancement alleged against Mr. Estrada and for no other purpose."

Estrada argues that he had a First Amendment right to possess these books and it was therefore improper to introduce them to prove the section 1101, subdivision (b) factors of motive, knowledge, planning, or preparation.  We are not persuaded.

All relevant evidence is admissible.  (§ 351.)  Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (§ 210.)  The trial court has " 'wide discretion' " in deciding the relevance of evidence.  (*People v. Kelly* (1992) 1 Cal.4th 495, 523; § 352.)  This court will not disturb a trial court's exercise of discretion in admitting evidence "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice . . . ."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)  To put it another way, a trial court's exercise of discretion will not be disturbed on appeal unless it appears that " 'the resulting injury is sufficiently grave to manifest a miscarriage of justice.  [Citation.] In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered.' "  (*People v. Green* (1995) 34 Cal.App.4th 165, 182-183.)

Here the trial court allowed Officer Whitfield to testify that three books were found in Estrada's residence and that they were entitled *Surgical Speed Shooting*, *The Gun Digest Book of Handgunnery*, and *Hit Man*.  Officer Whitfield did not elaborate on the contents of the books.  The prosecution's theory was that Estrada was a hired hit man—hired by Garcia to kill Achilli as contrasted with Garcia's theory that Estrada was a drug dealer and the murder resulted from a drug deal that went wrong.  The trial court limited the use of the evidence about the books to establish only Estrada's planning and preparation for the crime.  The jury was specifically told that they could not use the

30

evidence to establish that Estrada was a bad person or predisposed to commit a crime. The trial court's finding that the evidence was relevant was not an abuse of discretion.

As to Estrada's argument that he had a First Amendment right to possess these books and therefore it was error to admit the books into evidence because their possession was constitutionally protected, we perceive no violation of Estrada's First Amendment rights. Estrada was not charged with any crimes arising out of the possession of the books. Furthermore, the United States Supreme Court has held that "the Constitution does not erect a *per se* barrier to the admission of evidence" protected by "The First Amendment." (*Dawson v. Delaware* (1992) 503 U.S. 159, 165.)[18] As long as the evidence is relevant to some issue being tried, then it is admissible. (*Id.* at p. 164.) Here the evidence was relevant to Estrada's planning and preparation for the murder, as well as the allegation that the murder was committed for financial gain; the special allegation that Estrada committed the murder for financial gain makes relevant books that provide instruction on murder for hire. His notes that reflected techniques and advice from the books were relevant to establish planning and preparation.

Alternatively, Estrada argues that it was error to admit the books because their possession did not constitute misconduct within the meaning of section 1101, subdivision (b). In essence, Estrada's argument is that because section 1101, subdivision (b) refers to a crime, civil wrong or other act and the other act must be read in

---

[18]     In *Dawson v. Delaware*, *supra*, 503 U.S. 150, a capital case, the United States Supreme Court held that the introduction of evidence at the penalty phase of the trial of the defendant's membership in a White racist prison gang, the Aryan Brotherhood, violated the defendant's First Amendment rights. (*Id.* at p. 165.) However, the evidence had no relevance because the victim and the defendant were both white and there was no possible racial motivation for the killing. (*Id.* at p. 166.) Nor did the evidence have any other relevance; it simply presented the defendant's "abstract beliefs" and there was no attempt to link those beliefs to any factor relevant to the sentencing, or to the defendant's future dangerousness. (*Ibid.*)

context to mean misconduct and his possession of the books was perfectly legal, the trial court erred in admitting the books under Evidence Code section 1101, subdivision (b).

Section 1101 provides "(a) Except as provided in this . . . evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ."

The problem with Estrada's argument is that it is based on his assertion that "other act" in section 1101, subdivision (b) must be a bad act. He invokes the doctrine of *noscitur a sociis*, " 'it is known by its associates,' " which is the principle that " ' " 'the meaning of a word may be enlarged or restrained by reference to the object of the whole clause in which it is used.' " ' " (*Texas Commerce Bank v. Garamendi* (1992) 11 Cal.App.4th 460, 471, fn. 3.)

Estrada fails to mention that the principle of construction he invokes is applied as a secondary principle of statutory construction. (*Texas Commerce Bank v. Garamendi*, *supra*, 11 Cal.App.4th at p. 471.) The doctrine is merely an extrinsic aid to interpretation and is "to be used only when the clear meaning of the words used in the statute is doubtful . . . ." (*People v. Fields* (1980) 105 Cal.App.3d 341, 344; 2A Sutherland, Statutory Construction (7th ed. 2014) § 47.16, p. 353.) It "may not be used to create doubts or offset the plain meaning of the statutes [citation]." (*People v. Fields*, *supra*, at p. 344.) We must first consider "the primary rule of statutory construction that courts must attempt to ascertain the legislative purpose by reading the statute as a whole and in connection with related statutes." (*Texas Commerce Bank v. Garamendi*, *supra*, at p. 470.) "We begin by considering the statute's words because they are generally the

most reliable indicator of legislative intent." (*People v. Trevino* (2001) 26 Cal.4th 237, 241.)

The word "act" has a plain meaning. If the Legislature had intended to restrict the word "act" in section 1101, subdivision (b) to "bad" acts, it would have done so. It did not. Section 1101, subdivision (a) "makes no distinction between criminal and noncriminal conduct." (*People v. St. Andrew* (1980) 101 Cal.App.3d 450, 462.)

In *People v. Enos* (1973) 34 Cal.App.3d 25 (*Enos*), in a prosecution for burglarizing a private garage, the prosecution introduced evidence of two prior incidents involving garage burglaries. One of these had resulted in the defendant's conviction of receiving stolen goods and thus constituted a prior offense, but the other established no crime on his part and therefore amounted to merely a prior "act." (*Id.* at pp. 29-33, 42) In *Enos*, the defendant's prior "act" came in through the testimony of a witness, a Mrs. Scott, who stated that she had observed a man in her front yard looking into a bedroom window. As she stopped her car the man approached her and asked if a Mr. Garcia lived there; when she responded in the negative, the man asked her if Mr. Garcia lived in the area and when she responded she did not know, the man got in a Volkswagen and drove away. The witness was then asked by the prosecutor if the man she saw was in court. The witness responded, " 'I believe it is the defendant.' " (*Id.* at p. 33.) The *Enos* court framed the issue on appeal as "the relevancy of the subject evidence" and cited the applicable rule as that stated in section 1101, subdivisions (a) and (b). (*Enos*, *supra*, at p. 33.) The *Enos* court stated, "In the application of this rule in a criminal case the general test of admissibility is whether the evidence tends logically, naturally and by reasonable inference, to establish any fact material for the People, or to overcome any material matter sought to be proved by the defense. [Citations.] 'If it does, then it is admissible, *whether it embraces the commission of another crime or does not*, whether the other crime be similar in kind or not, whether it be part of a single design or not.' [Citations.]" (*Id.* at p. 34, italics added.) As to the incident that was a prior act

and not a crime, nor even a prior bad act, the *Enos* court stated, "We have no difficulty concluding that evidence of the incident occurring at Mrs. Scott's residence on September 15, 1971, was relevant to the issues . . . ." (*Id*. at p. 36.)

In a related argument, the defendant in *Enos* challenged an instruction requested by the prosecution, which told the jury that " 'Evidence has been received tending to show that the defendant committed [a crime] [crimes] other than that for which he is on trial. . . .' " (*Enos*, *supra*, 34 Cal.App.3d at p. 42.) He asserted that the court failed to inform the jury that he had not been arrested for or convicted of the November 10, 1970, burglaries and that no crime had been shown by the testimony of Mrs. Scott. (*Ibid*.)

The *Enos* court stated, "The subject instruction was clearly a correct statement of the law insofar as the . . . incident [that resulted in a conviction was] concerned since defendant was found guilty of receiving stolen property . . . . Accordingly, as limited to this offense the instruction was couched in proper language. Concerning the [Mrs. Scott] incident, there was no evidence that this constituted a crime nor did the prosecution make any claim or statement that it did. This incident constituted an 'act' rather than a crime, and as we have pointed out above, evidence of this act was admissible under Evidence Code section 1101. The trial court should have included the word 'act' in its instruction." (*Enos*, *supra*, 34 Cal.App.3d at p. 42.)

In sum, we reject Estrada's argument that the word "act" in section 1101, subdivision (b) refers to a bad act or misconduct.

Estrada raises numerous other arguments as to why the evidence concerning the books was inadmissible. As to his argument that the books were inadmissible because no witness testified as to how they were relevant, it was not necessary for a witness to testify as to their relevance. The court instructed the jury as to how they could use the evidence. The court had already determined that the book evidence was admissible and relevant. Relevancy is concerned with the probative quality of the evidence offered and it is the duty of the trial judge to determine relevance. (Pen. Code, § 1044.) "The relevancy of

proffered proof in a criminal case depends upon whether or not it tends to sustain a legitimate hypothesis of the guilt of the defendant and, generally speaking, an incidental fact is relative to the main fact in issue when, in accord with the ordinary course of events and common experience the existence of the incidental fact, standing alone or when considered in connection with other established facts, tends in some degree to make the main fact in issue certain. It is not necessary that such incidental fact should bear directly upon the main fact in issue, for it will suffice as a pertinent piece of proof if it can be said to constitute a link, however small, in the chain of evidence, and tends thereby to establish the existence of the main fact in issue. [Citation.]" (*People v. Billings* (1917) 34 Cal.App. 549, 552-553.) The strength of such tendency, or the amount of such weight, is to be determined by the jury. (*Moody v. Peirano* (1906) 4 Cal.App. 411, 418.)

The special circumstance allegation that Estrada committed the murder for financial gain makes relevant the books he possessed that provided instruction on murder for hire. His notes reflecting techniques and themes from the books were relevant to establish planning for the murder.

As to Estrada's argument that the books constituted bad character or propensity evidence, we note that the court instructed the jury that they could not consider the books as evidence that Estrada was a bad person or as to whether he possessed a bad character trait, or that he was predisposed to commit a murder. "Absent any contrary indication, we presume the jury followed this instruction." (*People v. Gray* (2005) 37 Cal.4th 168, 217.)

As to Estrada's argument that the books were more prejudicial than probative, we note that " '[a]ll evidence [that] tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence [that] uniquely tends to evoke an emotional bias against the defendant as an individual and which has

35

very little effect on the issues.  In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

Estrada argues that with regard to the book *Hit Man* the prosecutor urged the jury to read the entire book and that was the greatest source of prejudice here.  Estrada misreads the record; the prosecutor described for the jury portions of the book that he deemed were relevant, and told the jury, "you can look at the whole book.  It's fine to read, I wouldn't absorb the lessons of it, however."  This falls far short of urging the jury to read the entire book.  Even if one or more jurors had read the entire book, any material in the book that had no probative value on the issues for which it was admitted would have been disregarded by the jury because they were instructed that if the books did not directly relate to the planning or preparation or the motive or knowledge of the crime or special allegations against Estrada, they were to disregard those items of evidence.  Again, we must presume the jury followed this instruction. (*People v. Gray*, *supra*, 37 Cal.4th at p. 217.)

As to Estrada's argument that there was insufficient foundation that he personally read the books at the pertinent time, this does not preclude them from being admitted into evidence.  This argument goes to the weight of the evidence rather than its admissibility; the jury could have considered the prosecution's failure to establish that Estrada read the books and given little weight to them.  Of course, the parallels between Estrada's notes and the techniques and themes outlined in the books suggest that Estrada used them as reference.

As to Estrada's argument that the limiting instruction was inadequate to ensure that the jury used the books only for the designated limited purposes, we reiterate that we presume the jury followed the court's instructions. (See *People v. Richardson* (2008) 43 Cal.4th 959, 1004; *People v. Davis* (2005) 36 Cal.4th 510, 537.)  Recently, our Supreme Court reaffirmed this rule:  "We reject as entirely speculative defendant's assertion that these limiting instructions were inadequate.  'Any prejudice that the challenged

36

information may have threatened must be deemed to have been prevented by the court's limiting instruction to the jury. We presume that jurors comprehend and accept the court's directions. [Citation.] We can, of course, do nothing else. The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.' [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 866-867.) These repeated and plain holdings of our Supreme Court thus undermine Estrada's argument that "lay jurors could not ignore the powerful effect of those three books in evaluating [his] character."

Finally, as to Estrada's argument that the trial court failed to thoroughly read the challenged literature and therefore could not make a reasonable determination regarding their probative value rather than prejudicial effect, absent some evidence to the contrary, we must presume that the trial court adequately reviewed the evidence. (§ 664 [it is presumed that official duty has been regularly performed].) The record does not establish that the trial court failed to adequately review the evidence.

In sum, the trial court did not err in admitting into evidence books found in Estrada's home.

IV. *Alleged Error in Admitting into Evidence Hand Written Notes Found in Estrada's Home*

As noted, during the search of Estrada's apartment, officers found a purple notebook (People's exhibit No. 92) and a gray notebook (People's exhibit No. 93). During his argument to the jury, the prosecutor referred to some of the notes that were in the purple notebook. Estrada argues that it was error to admit these handwritten notes against him. He contends that they were inadmissible for the same reasons that the books and guns were inadmissible; and they were inadmissible because absent expert testimony that the handwriting was his, there was insufficient foundation to establish that he wrote the notes.

37

Initially, we note that although the notebooks were admitted into evidence, the court did not allow them to go back into the jury room absent a request by the jury to view them. No request by the jury to view exhibit Nos. 92 and 93 appears in the record.[19] Accordingly, we must conclude that the notebooks were never viewed by the jury.

As to Estrada's argument that the notebooks were inadmissible for the same reasons as the books and guns were inadmissible, we reject the argument for the same reasons noted *ante.*

As to Estrada's argument that there was no evidence to establish the authenticity of the writings, certainly a writing must be authenticated before being admitted into evidence or before secondary evidence of its contents is received. (§ 1401.) A writing is admissible if a finding of authentication is supported by a preponderance of the evidence. (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321.) The proponent of a writing satisfies the requirement of authentication when he or she introduces evidence sufficient to sustain a finding that the writing is what it is purports to be. (§ 1400.) Even if conflicting inferences can be drawn from the evidence supporting authentication, that consideration goes to the weight of the evidence and not to its admissibility. (*Jazayeri v. Mao*, *supra*, at p. 321.)

In other words, "[a]uthentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (§ 1400.)

---

[19]    We note for the record that we had the record augmented with exhibit Nos. 91, 92, and 93. The two notebooks exhibit Nos. 92 and 93 have a few scribbled drawings and a few notes written in Spanish, but the vast majority of the pages in exhibit No. 92 are blank. The majority of pages in exhibit No. 93 appear to be notes regarding drawing or sketching figures.

There are a number of methods by which an article may be authenticated. (§ 1410.) We review a trial court's decision regarding the admission of evidence for abuse of discretion. (*Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1078.)

Officer Whitfield testified that he recovered a purple notebook in Estrada's living room inside a Dell computer bag. He recovered a gray notebook in the dining room cabinet. Inside one of the notebooks was a letter addressed to Estrada from the United States Army Recruiting Command, Fort Knox, Kentucky. The police found numerous papers with Estrada's name on them inside the one-bedroom apartment. Authentication need not be established in any particular manner. "The law is clear that the various means of authentication as set forth in Evidence Code sections 1410-1421 are not exclusive. Circumstantial evidence, content and location are all valid means of authentication [citations]." (*People v. Gibson* (2001) 90 Cal.App.4th 371, 383.)[20]

We have taken judicial notice of and examined the notebooks and compared what is in them to what the books contain. There are several references in the notebooks that can also be found in the books—for instance, the handwritten notes talk about surveillance, military style precision, the use of gloves and disguises, and fake wigs, all

[20]    In *People v. Olguin* (1994) 31 Cal.App.4th 1355, for example, several sheets of rap lyrics were authenticated as having been authored by the defendant through evidence establishing their location when found—his bedroom—and their content—referring to the defendant's gang and identifying the composer with the defendant's gang moniker. Accordingly, they were properly admitted to establish the defendant's gang membership, his loyalty to his gang, his familiarity with gang culture, and "inferentially, his motive and intent on the day of the killing." (*Id.* at p. 1373.) Similarly, in *People v. Gibson,* two manuscripts were authenticated as the defendant's writings by their content—references to the author as " 'Sasha,' " one of the defendant's aliases, and descriptions of a prostitution enterprise similar to one operated by defendant as established by independent evidence—and the locations from which they were seized—the defendant's home and hotel room. The Court of Appeal held that the trial court had not erred in permitting the prosecution to use the documents to show that the defendant was acting as a madam. (*People v. Gibson*, *supra*, 90 Cal.App.4th at p. 382.)

of which are themes and concepts covered in the book *Hit Man*. At least one of the notes is written in the first person—"I will continue to progress into a better person." Further, located between the pages of one of the notebooks was a letter addressed to Estrada. Thus, both the content and location of the notebooks identified them as belonging to Estrada. Moreover, no evidence showed that these items belonged to anyone else. Therefore, the notebooks were properly authenticated and properly admitted into evidence.

In any case, even if the court erred, the error was harmless. Given the overwhelming evidence that this was a murder for hire and the eyewitness testimony from which the jury could conclude that Estrada was lying in wait, any error in admitting the notebooks was harmless under any standard of prejudice.

V. *Confrontation Clause Challenge to the Admission of Miguel's Oral and Written Statements*

As noted, Sergeant Frisby described his interview with Miguel because Miguel did not testify. According to Sergeant Frisby, Miguel said his cousin Daniel told him how to find Achilli's photograph on the Internet. Then, Miguel said that he printed out the photograph and "gave this photo[graph] to someone that he knew." Miguel also told Sergeant Frisby that "he gave someone $1500 in cash."

Estrada contends that he was denied his right to confront the witnesses against him by admission of Miguel's statements to the police because, in essence, Miguel's statement about giving things to "someone" inculpated him.

The confrontation clause of the Sixth Amendment of the United States Constitution provides that " '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' " (*Crawford v. Washington* (2004) 541 U.S. 36, 42 (*Crawford*).) The confrontation clause has traditionally barred "admission of testimonial statements of a witness who did not appear at trial unless he

was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Id*. at pp. 53-54.)

As the California Supreme Court explained recently, "The *Aranda/Bruton* rule[21] addresses a specific issue that arises at joint trials when the prosecution seeks to admit the out-of-court statement of a nontestifying defendant that incriminates a codefendant. As we have observed, ' "*Aranda* and *Bruton* stand for the proposition that a 'nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.' [Citation.]" [Citation.] The United States Supreme Court "limited the scope of the *Bruton* rule in *Richardson v. Marsh* (1987) 481 U.S. 200 . . . . The court explained that *Bruton* recognized a narrow exception to the general rule that juries are presumed to follow limiting instructions, and this narrow exception should not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial. (*Richardson*, *supra*, at pp. 206-207.)" ' [Citations.] The high court went on to hold in *Richardson* that admission of a nontestifying codefendant's confession against the defendant does not violate the defendant's confrontation right if the confession is redacted to eliminate not only the defendant's name but any reference to his existence. (*Richardson*, *supra*, at p. 211.) 'When, despite redaction, the statement obviously refers directly to the defendant, and involves inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial, the *Bruton* rule applies and introduction of the statement at a joint trial violates the defendant's rights under the confrontation clause.' [Citation.]" (*People v. Capistrano* (2014) 59 Cal.4th 830, 869.)

---

[21] *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.

41

The People argue that this claim has been forfeited because Estrada's counsel did not object to the introduction of the redacted statement and in fact reached an agreement with the prosecutor regarding the presentation of Miguel's statement.

No procedural principle is more familiar to the United States Supreme Court than that the failure to assert a federal constitutional right at trial can forfeit the right on appeal. (*United States v. Olano et al.* (1993) 507 U.S. 725, 731; cf. *United States v. Young* (1985) 470 U.S. 1, 15-16.) Alternatively, Estrada contends that trial counsel's failure to object to Sergeant Frisby's testimony that Miguel said he gave Achilli's photograph to "someone" he knew constituted ineffective assistance of counsel.

For reasons we will explain, we do not need to determine whether Estrada forfeited appellate review of this issue or whether the admission of Miguel's testimony through Sergeant Frisby constituted error under the confrontation clause because any such error was harmless beyond a reasonable doubt.[22]

Confrontation clause violations are subject to harmless error analysis under *Chapman v. California*, *supra*, 386 U.S. at page 24. (*People v. Lewis* (2008) 43 Cal.4th 415, 461, overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919.) This standard provides "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt. [Citations.]" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681.) "These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points,

---

[22] The statements that Estrada challenges do not lead to the inevitable conclusion that Achilli's photograph and the money were passed directly from Miguel to Estrada. In fact, the forensic evidence established that Cesar Chaidez's fingerprints were on the driving directions, which leads to the conclusion that Cesar Chaidez may have been a middle man between Miguel and Estrada.

42

the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.  [Citations.]"  (*Id*. at p. 684.)

In other words, improper introduction of a codefendant's out-of-court statement requires reversal only if the error was not harmless beyond a reasonable doubt.  (*People v. Archer* (2000) 82 Cal.App.4th 1380, 1390.)  "That analysis generally depends on whether the properly admitted evidence is so overwhelming as to the guilt of the nondeclarant that a reviewing court can say the constitutional error is harmless beyond a reasonable doubt."  (*Ibid*.)

Estrada's involvement in this crime was established by eyewitness testimony that showed that Estrada was present at the scene well before Achilli's murder; telephone records that established that Estrada and Miguel were in almost constant communication on the day of the murder and evidence left at the scene of the crime.  Estrada's fingerprints were found on the directions to Achilli's residence and his DNA was found on the gloves, jacket, and baseball cap recovered from the scene.  There was gunshot residue on the gloves.  The telephone records showed that Estrada and Miguel telephoned each other repeatedly on the morning of the murder and at least one of the calls was picked up by the Los Gatos cellular tower.  The police recovered a black bag containing $2,000 cash from Estrada's apartment as well as a baseball cap similar to the one recovered from the scene of the crime.  Further, Daniel's testimony established that he asked Miguel if he knew someone who could take care of a problem; and they agreed on a price of $9,500.  This overwhelming evidence establishes that this was a murder for hire situation and that Estrada premeditated the murder—any error in the admission of Miguel's statements that he gave "someone" Achilli's photograph and $1,500 in cash were harmless beyond a reasonable doubt.  (*People v. Jefferson* (2008) 158 Cal.App.4th 830, 845.)

43

VI. *Confrontation Clause Challenge to Dr. O'Hara is Testifying to the Cause of Death*

Both Estrada and Miguel complain that they were denied the right to confront a witness against them because the forensic pathologist who testified at trial had performed the autopsy on Achilli or written the autopsy report.[23] They claim they were denied the right to confront a witness against them because Dr. Happy, who conducted the autopsy on Achilli's body, was unavailable for them to cross examine.

*Pertinent Case Law*

*Crawford*, *supra*, 541 U.S. 36, did not specify what constitutes a testimonial statement for purposes of the confrontation clause, but offered examples of the "[v]arious formulations of this core class of 'testimonial' statements," i.e., " '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; [and] 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]." (*Id*. at pp. 51-52.)

Subsequently, the high court explained that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington* (2006) 547 U.S. 813, 822 (*Davis*).)

---

[23] Miguel joins in Estrada's argument and adds his own substantive argument.

Three years later, the United States Supreme Court issued its 5-4 decision in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*), where the trial court had "admitted into evidence affidavits reporting the results of forensic analysis[,] which showed that material seized by the police and connected to the defendant was cocaine. The question presented [was] whether those affidavits [were] 'testimonial,' rendering the affiants 'witnesses' subject to the defendant's right of confrontation under the Sixth Amendment." (*Melendez-Diaz*, *supra*, 557 U.S. at p. 307.) The court determined that, since "[t]he 'certificates' are functionally identical to live, in-court testimony" (*id.* at pp. 310-311) and were made to provide prima facie evidence of the composition, quality, and weight of the analyzed substance, under *Crawford* they were "testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment." (*Id.* at p. 311.) The "testimonial" documents were therefore not admissible, because the analysts were not subject to cross-examination and the petitioner had no prior opportunity to cross-examine. (*Ibid.*)

In *Bullcoming v. New Mexico* (2011) 564 U.S. __, __ [131 S.Ct. 2705, 2709] (*Bullcoming*), the defendant's blood sample was sent to a state lab for testing after he was arrested for drunk driving. The analyst recorded the results on a state form and signed the form, which included a " 'certificate of analyst.' " (*Id.* at pp. __ [131 S.Ct. at pp. 2709, 2710].) A reviewer certified that the analyst was qualified and that established procedures had been followed. (*Id.* at p. __ [131 S.Ct. at p. 2711].) At Bullcoming's trial, the analyst who tested his blood sample did not testify because he had been placed on disciplinary leave. (*Id.* at pp. __ [131 S.Ct. at pp. 2711-2712].) The prosecution called another analyst who was familiar with the lab's testing procedures but had not signed the certification, nor had he participated in, observed, or reviewed the analysis of Bullcoming's sample. (*Id.* at pp. __ [131 S.Ct. at pp. 2710, 2712, 2713].)

The plurality opinion in *Bullcoming* explained that the surrogate analyst was an inadequate substitute for the analyst who performed the test. Surrogate testimony by

45

someone who is qualified as an expert regarding the machine used and the lab's procedures could not convey what the actual analyst knew or observed and would not expose "any lapses or lies" by the certifying analyst. (*Bullcoming*, *supra*, 564 U.S. at p. __ [131 S.Ct. at p. 2715].) The court stated that, if the Sixth Amendment is violated, "no substitute procedure can cure the violation." (*Bullcoming*, *supra*, at p. __ [131 S.Ct. at p. 2716].)

*Bullcoming* reiterated the principle stated in *Melendez-Diaz* that a document created solely for an evidentiary purpose in aid of a police investigation is testimonial. (*Bullcoming*, *supra*, 564 U.S. at p. __ [131 S.Ct. at p. 2717].) Furthermore, even though the analyst's certificate was not signed under oath, as occurred in *Melendez-Diaz*, the two documents were similar in all material respects. (*Ibid.*)

Thereafter, in *Michigan v. Bryant* (2011) 562 U.S. 344 [131 S.Ct. 1143] (*Bryant*), the United States Supreme Court considered whether admission of a mortally wounded victim's statements to police officers violated the confrontation clause. (*Id.* at p. __ [131 S.Ct. p. 1150].) Police officers asked the victim what had happened and who had shot him. The victim identified the defendant and said the shooting had occurred about 25 minutes earlier. (*Ibid.*) The high court held that the primary purpose of the interrogation was to enable law enforcement to meet an ongoing emergency. (*Id.* at pp. __ [131 S.Ct. at pp. 1150, 1164].) In its description of " 'ongoing emergency,' " the high court identified several factors that informed the determination of the primary purpose of the questioning, such as the formality of the encounter, and the statements and actions of both the declarant and the interrogator. (*Id.* at pp. __ [131 S.Ct. at pp. 1160-1161].) Quoting from *Davis*, *supra*, 547 U.S. at page 822, the United States Supreme Court noted, "[W]e cannot say that a person in [the victim's] situation would have had a 'primary purpose' 'to establish or prove past events potentially relevant to later criminal prosecution.' " (*Bryant*, *supra*, at p. __ [131 S.Ct. at p. 1165].) Under all

46

of the circumstances of the encounter, the court concluded the victim's identification of the defendant was not testimonial hearsay. (*Id*. at pp. __ [131 S.Ct. at pp. 1166-1167].)

In *Williams v. Illinois* (2012) 562 U.S. __ [132 S.Ct. 2221] (*Williams*), the statements at issue were those of a prosecution expert who testified that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police laboratory using a sample of the petitioner's blood. (*Id*. at p. __ [132 S.Ct. at p. 2227].) A plurality of four justices held in part, "Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." (*Id*. at p. __ [132 S.Ct. at p. 2228].) The plurality offered a second basis for its decision, stating that, even if the report in question had been admitted into evidence, it was not testimonial in that it was not sought for the purpose of obtaining evidence to be used against the petitioner, who was not a suspect at the time. (*Id*. at pp. __ [132 S.Ct. at pp. 2228, 2243].) The plurality observed that "[t]he abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." (*Id*. at p. __ [132 S.Ct. at p. 2242].)

Justice Thomas joined the four justices of the plurality solely in the judgment. Justice Thomas concluded that the disclosure of Cellmark's out-of-court statements by means of the expert's testimony did not violate the Confrontation Clause for the sole reason that the expert's testimony "lacked the requisite 'formality and solemnity' to be considered ' "testimonial" ' for purposes of the Confrontation Clause." (*Williams*, *supra*, 562 U.S. at p. __ [132 S.Ct. at p. 2255] (conc. opn. of Thomas, J.).)

The remaining four justices joined in a vehement dissent authored by Justice Kagan in which the conclusion that the expert's testimony was not offered for its truth

47

was found to have no merit and was labeled a "prosecutorial dodge." (*Williams*, *supra*, 562 U.S. at p. __ [132 S.Ct. at pp. 2265, 2268] (dis. opn. of Kagan, J.).) Since Justice Thomas also believed that "statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose" (*id.* at p. __ [132 S.Ct. at p. 2257] (conc. opn. of Thomas, J.)), the dissent asserted that "Five justices specifically reject every aspect of [the plurality's] reasoning and every paragraph of its explication." (*Id.* at p. __ [132 S.Ct. at p. 2265] (dis. opn. of Kagan, J.).)

Nevertheless, in *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), the California Supreme Court held that statements in an autopsy report describing a nontestifying pathologist's observations of the condition of the victim's body are not testimonial because the primary purpose of recording such facts does not pertain to a criminal investigation. (*Id.* at pp. 619, 622.) Accordingly, the *Dungo* court concluded that testimony by a pathologist based on the report (including photographs) prepared by the nontestifying pathologist did not violate the defendant's confrontation clause rights even though he was unable to confront and cross-examine the nontestifying pathologist. (*Id.* at p. 621.)

In *People v. Edwards* (2013) 57 Cal.4th 658 (*Edwards*), the California Supreme Court reiterated that "[a]utopsy statements that simply record anatomical and physiological observations" are distinct from "statements of the autopsy physician's expert forensic conclusion as to the cause of death. [Citation.]" (*Id.* at p. 706.) Without deciding whether statements in the latter category are testimonial, *Edwards* held it was permissible for an expert witness to recount the autopsy doctor's findings that the victim's nose was fractured, the injury to her ear was " 'incisional,' " she had residue from adhesive tape around her mouth, and her vagina had signs of trauma. (*Id.* at pp. 707-708.) Distinguishing those findings from forensic opinions about the cause of death, the court determined it was permissible for the expert to rely on them because they

48

merely reflected the autopsy doctor's "medical observations of objective fact." (*Id*. at p. 708.)

The problem in this case is that although Dr. O'Hara testified to autopsy statements that simply recorded anatomical and physiological observations, when asked what was the cause of Achilli's death, Dr. O'Hara recounted that "Dr. Happy phrased it as gunshot wounds of the head and torso." In other words, Dr. O'Hara was testifying to a statement regarding the autopsy physician's expert conclusion as to the cause of death. Nevertheless, we need not decide whether Dr. Happy's cause of death conclusion was testimonial in nature because even if we assume error in the admission of Dr. O'Hara's statement as to Dr. Happy's conclusion as to the cause of death, any error was harmless beyond a reasonable doubt. There was no dispute as to Dr. Happy's cause of death opinion.

## VII. *Cumulative Error*

Estrada contends that the cumulative prejudice of the several errors and/or instances of ineffective assistance of counsel requires that we reverse his conviction. However, reversal based on cumulative error is required only if a high number of instances of error occurring at trial create a strong possibility that "the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone." (*People v*. *Hill* (1998) 17 Cal.4th 800, 845.) For instance, in *People v*. *Hill*, *supra*, at pages 844 through 847, the court concluded that the cumulative impact of constant and outrageous misconduct by the prosecutor and several legal errors occurring at trial "created a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors." (*Id*. at p. 847.)

Certainly, " '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' [Citation.]" (*People v*. *Cunningham* (2001) 25 Cal.4th 926, 1009.) The combined effects

49

of multiple errors may indeed render a trial fundamentally unfair. (See *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) However, as discussed *ante*, since we have found none of Estrada's claims of error meritorious and/or prejudicial, a cumulative error argument cannot be sustained. No serious errors occurred, which, whether viewed individually or in combination, could possibly have affected the jury's verdict. (*People v. Martinez* (2003) 31 Cal.4th 673, 704; *People v. Valdez* (2004) 32 Cal.4th 73, 128.) Simply put, since we have found no substantial error in any respect, appellant's claim of cumulative prejudicial error must be rejected. (*People v. Butler* (2009) 46 Cal.4th 847, 885.) Estrada was entitled to a fair trial, not a perfect one. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057.)

## *Miguel's Issues*

### I. *Challenge to the Admission of His Confession*

Before trial, the court conducted a hearing, during which Miguel testified, on the admissibility of his statements to the police. At the end of the hearing the trial court denied Miguel's motion to suppress his statements. Miguel contends that the trial court erred in so doing.

The section 402 hearing established the following. On the morning of March 28, 2008, two police officers were watching Miguel near his residence in Duarte in Los Angeles County. They saw a Dodge Durango leave the residence and followed it to a gas station. As Miguel started to pump gas, four officers with guns arrested him and his brother Cesar at 8:46 a.m. Miguel was placed in a police car and taken to the Monrovia Police Department.

Miguel was kept in a holding cell at the police station in a white paper suit and paper slippers until approximately 3:00 p.m. During this time he was fed. Two officers put Miguel in waist chains and brought him back to the Santa Clara Police Department in a vehicle. At the time, Miguel was barefoot and wore shorts and a tank top.

50

During the four-and-a-half-hour trip from Los Angeles County to Santa Clara, the officers did not tell Miguel why he had been arrested and did not talk about the case at all. They may have said that his name had come up during a homicide investigation. Miguel sat in the front seat of the car and again was fed during the trip. The officers did not read Miguel his *Miranda* rights and did not question him about the case; Sergeant Frisby had specifically instructed them not to ask any questions.

When they arrived at the Santa Clara Police Department at about 7:30 p.m., the officer turned Miguel over to Sergeant Frisby and Detective Wahid Kazem. At the very beginning of the interview, after Miguel was read his *Miranda* rights, Sergeant Frisby asked if Miguel had any questions and Miguel asked if the officers knew what had happened to his brother; Miguel was concerned about his brother's welfare. When Miguel expressed his concern about Cesar, the officers told him that "Cesar had been cooperative" and that he was "okay." One officer told him that what he had to say "may clear some things up with Cesar." Miguel proceeded to tell the officers about his involvement in the murder.

Miguel testified that he and his brother were taken in separate police cars to the Monrovia police station and that was the last he saw of him. When Sergeant Frisby and Detective Wahid took him out of the holding cell, he saw his cousin Daniel in another cell. The officers told him that Daniel had "been real helpful."

Miguel said that his brother Cesar was only nine months younger than he was, but he did not mature as fast; Miguel had "kind of like a parental feeling" toward Cesar. Miguel testified that he had "more than a brotherly relationship with [his] brother" and had "a bit of a hand in his upbringing"; further, being the older one his "first instinct [was] always . . . to protect him.

According to Miguel, at the time of his interrogation he was really tired. He had been up for about 36 hours without sleep. He had used "crystal meth" to stay awake because he had gone to school the previous day from 3:00 p.m. to 2:00 a.m. Miguel said

51

that he had never been arrested before. If his brother had not been in custody and the police had not told him, in essence, that he could clear things up for his brother, he probably would not have made any statements. Miguel acknowledged that he was read and understood his *Miranda* rights; he testified that he voluntarily spoke to the police after they advised him of his rights.

Miguel argues that he was "concerned about the wellbeing of his younger brother, Cesar, [whom] he had last seen when the two were on the ground, held at gunpoint and arrested by the police at a gas station hundreds of miles from where [he] was later that day taken and interrogated." Further, he testified that "his relationship with his Cesar was more than that of a brother but rather that of a protector and almost father." Miguel asserts that under the totality of the circumstances test, including the lengthy delay between arrest and interrogation, his confession was involuntary.

Both the United States Constitution and the California Constitution forbid the use of a defendant's involuntary confession against him at trial. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 15.) The People bear the burden of proving the voluntariness of a defendant's confession by a preponderance of the evidence. On appeal, we consider the totality of the circumstances surrounding the confession. We uphold the trial court's findings as to the circumstances of the confession if they are supported by substantial evidence. However, we independently review the trial court's finding as to the confession's voluntariness. (*People v. Markham* (1989) 49 Cal.3d 63, 65, 71; *People v. McWhorter* (2009) 47 Cal.4th 318, 346-347.)

" ' "A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' " ' " (*People v. Duff* (2014) 58 Cal.4th 527, 555.) No single factor is determinative of voluntariness; courts consider "the totality of circumstances" surrounding the confession. (*People v. Williams* (1997) 16 Cal.4th 635, 660.) Factors to consider include " 'the crucial element

of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' " (*Ibid*.) Other characteristics of the defendant to be considered are his or her age, sophistication, prior experience with the criminal justice system, and emotional state. (*In re Shawn D*. (1993) 20 Cal.App.4th 200, 209.)

In this case, the undisputed evidence establishes that over the course of the interrogation, whether measured from the time of his arrest at 8:46 a.m., or the time the interrogation began approximately 10 hours later, Miguel was given food and drink; and he had the opportunity to use the restroom and rest in the holding cell for approximately five hours before he was transported. During the trip to Santa Clara, Miguel was again fed and was seated in the front seat of the car and was chatting to the officers about football and sports. Undoubtedly Miguel was stressed and tired, but the record does not establish that either the length or circumstances of the interrogation were so severe as to render his admissions involuntary. Miguel did not indicate that he was tired or hungry or wished to use the restroom and was told that he could not. Miguel's interrogation "was not accompanied by a denial of all creature comforts or accomplished by means of physical or psychological mistreatment, threats of harsh consequences or official inducement amounting to coercion . . . ." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 58.)

The questioning was not aggressive or confrontational; and the officers did not threaten to arrest another family member or to release a family member if Miguel gave a statement. The fact that Miguel asked about Cesar and the officers agreed to update him on his brother's situation does not alter our conclusion that Miguel's confession was voluntary. The police did not deceive Miguel in an attempt to gain a confession. Their assurances that Cesar had been cooperative and was "okay" and that Miguel could "clear

53

some things up with Cesar" were not " ' "of a type reasonably likely to procure an untrue statement.' " [Citation.]" (*People v. Jones* (1998) 17 Cal.4th 279, 299.)

Further, Miguel's claim of psychological coercion is rebutted by his testimony at the section 402 hearing that he voluntarily spoke to the officers. While it is apparent that initially Miguel was concerned about his brother, nothing in the officers' words or actions suggested that they would release Cesar only if Miguel confessed to being involved in the murder of Achilli. We see no connection between Miguel's inquiry about his brother and Miguel's subsequent confession. The officers never stated or implied that a statement from Miguel confessing to the murder would cause them to free Cesar.

In sum, having reviewed the transcript of Miguel's interview, we conclude that Miguel's confession was voluntarily given; we see no threats or coercion of any kind. Although Miguel had never been in trouble with the police before, he is an adult who at the time of his interrogation understood the officer's *Miranda* warning, but elected to voluntarily speak with them.

II. *The Trial Court's Interruption of Counsel's Closing Argument*

At the end of his closing argument, Miguel's counsel told the jury, "Now, Ladies and Gentleman, I'm going to close and I'm going to tell you what I just want you to consider and what I'd like you to do. [¶] I believe that the Mark Achilli killing, you know, does not demand revenge but I think it does demand justice. Okay? [¶] Miguel Chaidez is not asking you to hold him totally blameless. He should have told Daniel Chaidez to go to hell the first phone call he got, but he didn't. [¶] But look at the evidence and ask whether he should be held to the same level of responsibility as the actual killer than the person who called the shots and did what was done here. Where do you get the basis of the information to imply the intent to kill with him, and it has to be implied because he never said it, and the malice aforethought. [¶] Does he deserve compassion? And my answer to that is probably not. We're all responsible for our behavior, are we not? [¶] But there's another concept in our law that we haven't talked

54

about yet and that's extremely important, and that's the concept of mercy. And mercy is the granting of forgiveness and the tempering of punishment when one does not necessarily—" At this point the court interrupted counsel to ask if he was "suggesting that the jury use mercy in coming to their verdict." Counsel asked the court, "Is there an instruction against it? The court replied that it thought the argument was "improper" because the jury had to decide the case "based on the facts, not sympathy or feeling for or against a defendant . . . which I would put mercy in there."

Later outside the presence of the jury, Miguel's counsel objected to the court preventing him from making his argument. Specifically, counsel told the court "I do object to the Court's ruling on the issue of mercy. I have used that twice in death penalty cases and never been overruled. Used it in a third one and two of us were going to be held in contempt by the judge. So it seems to me that this is not a question of rule of law, this is a question of an opinion about whether a given judge wants it used in a trial or not used in a trial. And I don't see where mercy has any problem with this situation. It's not sympathy. By definition it is not sympathy." The court responded, "I think it invokes sympathy. I think it invokes, I don't know, jury nullification. I don't know what the idea of mercy is. But in any event, I think it's improper argument, and I so ruled."

Miguel argues that the court erred in interrupting his counsel's argument and forbidding him from urging mercy.

"A criminal defendant has a well-established constitutional right to have counsel present closing argument to the trier of fact. [Citations.] This right is not unbounded, however; the trial court retains discretion to impose reasonable time limits and to ensure that argument does not stray unduly from the mark. [Citation.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 854.)

Penal Code section 1044 states, "It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective

ascertainment of the truth regarding the matters involved." This section vests the trial court with broad discretion to control the conduct of criminal trials. (*People v. Calderon* (1994) 9 Cal.4th 69, 75; *People v. Cline* (1998) 60 Cal.App.4th 1327, 1333.)

Certainly, in the context of a capital case, at the penalty phase of the trial the jury may consider granting the defendant mercy. Contrary to Miguel's argument, in a criminal case the concepts of mercy and sympathy are interchangeable. (See, e.g., *People v. Seaton* (2001) 26 Cal.4th 598, 685; *People v. Wader* (1993) 5 Cal.4th 610, 663 [no error in rejecting defendant's mercy instruction because the trial court instructed the jury it was to consider, if applicable, any sympathy that the defendant offered as a basis for a sentence less than death]; *People v. Lucas* (2014) 60 Cal.4th 153, 312 [prosecutor's improper reference to higher authority—that only God may grant mercy—was cured by the court's admonition and the court's standard instructions listing mercy as a factor to consider].)

However, the argument that Miguel's counsel tried to give at the guilt phase of this trial—that the jury should consider granting Miguel mercy—was in fact seeking to have the jury consider punishment, a circumstance that the jury is not allowed to consider. (CALCRIM No. 3550 [jury must reach verdict without any consideration of punishment].) A defendant's potential punishment is not a proper matter for jury consideration. (*People v. Thomas* (2011) 51 Cal.4th 449, 486.)

Miguel's attempt to elevate this issue to one of constitutional dimension is unavailing. Miguel's counsel was not denied the right to present a defense or argue facts and circumstances favorable to that defense or point out weaknesses in the prosecution's case. (See *Herring v. New York* (1975) 422 U.S. 853, 862 [the value of closing argument is not the opportunity to say any words to the jury whatsoever, but to present the defense's theory and point out weaknesses in the prosecution's case].) Miguel's assertion that he was prejudiced because the court made it appear that his counsel was acting improperly in making an impermissible or illegal argument and this destroyed whatever

56

rapport counsel had with the jury is based on no more than speculation. Further, given that the court instructed the jury that they were not to "take anything [the court] said or did during the trial as an indication of what [the court thought] about the facts, the witnesses, or what [their] verdict should be," we can see no way that Miguel was prejudiced by the court's interruption of his counsel's improper argument.

III. *Alleged Error in Admitting Evidence of Guns Seized from Miguel's and Estrada's Homes*

The police officer who searched Miguel's residence in Duarte on the day that Miguel was arrested testified that he seized an SKS rifle, a casing from a .9mm bullet, and an Airsoft replica gun and an article related to a gang-related shooting from the residence. In addition, officers seized three .45-caliber handguns from Estrada's residence.

Miguel contends that the evidence about guns recovered from his residence and Estrada's residence violated his right to a fair trial.

As to the testimony regarding the guns seized from Estrada's residence, Miguel did not object to the evidence at trial. Section 353, subdivision (a), provides that a judgment shall not be reversed because of the erroneous admission of evidence unless there was a timely objection "so stated as to make clear the specific ground of the objection . . . ." " 'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal. [Citation.]' [Citation.]" (*People v. Zapien, supra*, 4 Cal.4th at p. 979.) Accordingly, this issue may not be raised for the first time on appeal. (*People v. Welch* (1972) 8 Cal.3d 106, 114-115.)

57

As to the evidence of the guns found in Miguel's residence, counsel did not object to this evidence until after it was introduced. The belated objection was on the basis that the evidence concerning the guns was irrelevant and should have been excluded under section 352. Miguel did not urge exclusion of the evidence on federal due process grounds. Ordinarily, an objection based on state law does not preserve a claim based on the United States Constitution. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1028 & fn. 19.) A defendant's objection must apprise the trial court of the pertinent evidentiary analysis it should undertake to determine admissibility. Nonetheless, we conclude that Miguel "may make a very narrow due process argument on appeal. He may argue that the asserted error in admitting the evidence over his Evidence Code section 352 objection had the additional legal consequence of violating due process." (*People v. Partida*, *supra*, 37 Cal.4th at p. 435.)

As noted *ante*, "[e]vidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons—a fact of no relevant consequence to determination of the guilt or innocence of the defendant. [Citations.]" (*People v. Henderson*, *supra*, 58 Cal.App.3d at p. 360.)

Nevertheless, in this case the parties stipulated that the court would admonish the jury to disregard the testimony about the guns recovered from Miguel's residence. The court so instructed the jury: "Ladies and Gentleman of the Jury, you are not to consider the rifle and pellet gun seized from 1610 Fairdale Avenue because those items are not relevant to the charges against the defendants in this case or any other case." Thus, any error in admitting the evidence of the guns found in Miguel's residence was cured by the stipulation read to the jury to disregard the evidence. We presume the jury followed this unambiguous and specific instruction. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139; *People v. Holt* (1997) 15 Cal.4th 619, 662 [jurors are presumed to understand and follow the court's instructions].) "Cases may arise in which the risk of prejudice inhering in

material put before the jury may be so great that even a limiting instruction will not adequately protect a criminal defendant's constitutional rights.  [Citations.]"  (*Francis v. Franklin* (1985) 471 U.S. 307, 325, fn. 9.)  This is not such a case.

IV.  *Cumulative Error*

Miguel argues that the cumulative effect of the errors he has described so infected the trial with unfairness as to make his conviction a denial of due process.

As noted, reversal based on cumulative error is required only if a high number of instances of error occurring at trial creating a strong possibility that "the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone." (*People v. Hill*, *supra*, 17 Cal.4th at p. 845.)

Similar to Estrada's claim of cumulative error, since we have found none of Miguel's claims of error meritorious and/or prejudicial, a cumulative error argument cannot be sustained.  No serious errors occurred, which, whether viewed individually or in combination, could possibly have affected the jury's verdict.  (*People v. Martinez*, *supra*, 31 Cal.4th at p. 704; *People v. Valdez*, *supra*, 32 Cal.4th at p. 128.)  Simply put, since we have found no substantial error in any respect, appellant's claim of cumulative prejudicial error must be rejected.  (*People v. Butler*, *supra*, 46 Cal.4th at p. 885.)  Similar to Estrada, Miguel was entitled to a fair trial, not a perfect one.  (*People v. Bradford*, *supra*, 14 Cal.4th at p. 1057.)

V.  *Joinder in Estrada's Arguments*

Pursuant to California Rules of Court, rule 8.200(a)(5) and rule 8.360(a), Miguel joins in all arguments raised by Estrada.  Joinder in appellate arguments is broadly permitted.  (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)  However, as to the joined arguments, a joining defendant must individually meet his or her burden to demonstrate error and prejudice.  (*Id.* at p. 510, fn. 11.)  A defendant cannot rely solely on a codefendant's arguments and reasoning to satisfy his or her own burden on appeal.

59

(*Ibid.*)  To the extent Miguel has not satisfied this burden on appeal, we consider a given issue only as to the defendant who raised it.[24]  (*Ibid.*)

***Garcia's Issues***

Since the majority of Garcia's issues on appeal are concerned with ineffective assistance of counsel, we set forth in detail the law in this area.

A criminal defendant has a right to the assistance of counsel.  (*Strickland v. Washington* (1984) 466 U.S. 668, 684-685 (*Strickland*).)  This right "entitles the defendant not to some bare assistance but rather to effective assistance." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215 (*Ledesma*), italics omitted.)  "To establish entitlement to relief for ineffective assistance of counsel the burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings. [Citations.]" (*People v. Lewis* (1990) 50 Cal.3d 262, 288.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, at p. 694.)

"When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)

"In determining whether counsel's performance was deficient, a court must in general exercise deferential scrutiny . . ." and must "view and assess the reasonableness of counsel's acts or omissions . . . *under the circumstances as they stood at the time that*

---

[24]    The one exception is Miguel's confrontation clause challenge to Dr. O'Hara's testimony, where he joins in Estrada's argument, but submits substantive argument on his own behalf.

*counsel acted or failed to act.*" (*Ledesma*, *supra*, 43 Cal.3d at p. 216, italics added.) Although deference is not abdication (*id*. at p. 217), courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight. (*People v. Kelly*, *supra*, 1 Cal.4th at pp. 522-523.)

"In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

With this background in mind we proceed to address each of Garcia's claims of ineffective assistance of counsel.

## I. *Ineffective Assistance of Counsel—Failure to Present Exculpatory Evidence*

Garcia contends that his trial counsel was ineffective in failing to present evidence relating to an independent motive for the murder unrelated to him.

*Background*

Robert Jacome testified for the prosecution at the preliminary hearing in this case, which was held on December 16, 2008.[25] Jacome said that he first spoke to the police on April 7, 2008, and told them that he would fully cooperate. On March 13, 2008, Estrada called him and asked him to take him to Northern California; Estrada said he needed to go on "a gun mission." Estrada did not tell him many details other than it was for a "debt collection" related to drugs. Estrada paid him $100 for the ride. They left Southern California at about 8:00 p.m. and arrived in San Jose at approximately 1:00 to 1:30 a.m. They checked into a hotel and ate at a Burger King. On the way up from Southern California Estrada was using an "Internet printout" with driving directions.

_____

[25] Jacome testified pursuant to a plea agreement; the terms of the agreement were that he would plead guilty to lesser charges in this case in exchange for a maximum prison sentence of six years and eight months in exchange for his truthful testimony.

Jacome said that he and Estrada stayed at the hotel; early in the morning he heard a clicking noise, "like a racking of a gun." Jacome looked up and saw a black object, which in his "mind made sense it was a gun." Jacome went back to sleep. When he awoke again Estrada was gone. When Estrada returned he had no facial hair. Estrada asked Jacome to drive him to a place and Jacome dropped him off at a small street off of Highway 9. Jacome went to a Walgreens that was down the street and parked. When Jacome dropped off Estrada, Estrada said he was going to talk to an individual to collect the money; he said he would call Jacome when he was done. It was approximately 10:00 a.m. to 10:15 a.m. when he dropped off Estrada.

Jacome read a newspaper in the Walgreens parking lot and made a couple of telephone calls. Sometime later he received a telephone call from Estrada; Estrada sounded panicked. Estrada told Jacome to pick him up. The telephone call occurred at 11:38 a.m. Jacome saw Estrada off Highway 9; he had on a different set of clothes and he was running toward Jacome. Estrada had on a green and brown sweater and no hat. When Jacome had dropped him off, Estrada had been wearing black; he had on a black hat, a black zip-up sweater, and black pants and he was carrying a black bag. Jacome realized that something was wrong when he saw two police cars racing up the street with sirens on. When Estrada got into Jacome's car, he "said something to the effect, I did it, I did it."

On the drive back to Southern California, Estrada made a telephone call. Jacome did not know who it was until Estrada mentioned Miguel's name; Jacome had met Miguel before. Estrada told Miguel "something to the effect he was going to . . . pick up some money later on that day or the next day." Jacome did not hear Estrada say anything about being sorry about what had happened. In fact, Estrada said repeatedly that he had no remorse.

About an hour into the drive, Jacome asked Estrada what had happened because he had no idea what was going on. Estrada said that he shot an individual in the side of the

62

head. Estrada said it was not "like the movies"; a little fountain of blood came out of the person's head. Jacome realized what had happened and he became confused and scared. Jacome testified that he thought it was going to be a robbery—a debt collection. He had no idea that there was going to be a murder. Jacome did not ask Estrada any more questions because he was scared; he just wanted to get back home. Estrada told him he was getting paid $3,000, but did not say from whom he was getting it. Estrada asked Jacome if he wanted to go with him to collect the money, but Jacome said no.

Garcia argues that his counsel knew of Jacome's testimony before trial, but failed to call him as a witness at trial.[26] In fact, on October 4, 2010, before the presentation of the defense case, Garcia's counsel told the court that he had made a tactical decision not to call Jacome in his case in chief. The court told Garcia's counsel that he wanted to have an in-chambers discussion with counsel regarding the issue. At the end of the day, the court and Garcia's counsel went into chambers. The court made the following record at the in-chambers conference.[27] "A couple of days ago, last week, Mr. Robertson [Garcia's counsel] brought to my attention that he intended to call a witness, Robert Jacome, and his purposes for calling that witness had to do with—his proffer was that Mr. Estrada, on the drive up from Los Angeles to Los Gatos, told Mr. Jacome that they

---

[26] Garcia claims that Mr. Robertson did not attempt to interview Jacome and this constituted ineffective assistance of counsel. Mr. Robertson did not need to interview Jacome as he was fully aware of Jacome's preliminary hearing testimony; and since Mr. Robertson was present at the preliminary hearing and cross-examined Jacome, Mr. Robertson was able to see and hear how he testified on both direct and cross-examination and as to what he testified.

[27] The certified reporter's transcript of the ex parte chambers conference was submitted as an exhibit (F) to Garcia's motion for a new trial and on the request of Garcia's counsel was ordered unsealed. It appears that the cover sheet of this transcript correctly identifies the day of the hearing—October 4—but incorrectly specifies that it was 2011. The confidential cover sheet and the transcript itself notes the correct year 2010, but has a date of August 25. We have no doubt, however, that the transcript submitted with the new trial motion is the transcript of the in-chambers conference held on October 4, 2010.

were coming up either to collect for a drug debt or a drug hit, and I can't remember exactly which one you said. He brought that up. [¶] He also commented that he was concerned about that because it was pivotal to the defense of Mr. Garcia. We had discussion regarding the admissibility of that evidence just in general. And then subsequently, I, after talking with research, provided counsel with a citation to a case which I now don't have in front of me, but which was an unpublished decision which cited other cases which suggested that that testimony would, in fact, be admissible if Mr. Jacome was permitted to testify. [¶] During that meeting, Mr. Gillan who represents Mr. Estrada indicated that if Jacome were called to testify to that, that he anticipated that Mr. Estrada would testify in rebuttal and deny those statements, and/or testify affirmatively that that was not the purpose of the shooting. And at that point, I believe Mr. Robertson brought up the fact that his client had advised him that there were statements made in the jail by Mr. Estrada to the effect that he would testify, and if he was going to be convicted, everyone else would be as well. [¶] I bring that up as a sort of backdrop for this, because in getting the list of witnesses that Mr. Robertson intends to call on behalf of Mr. Garcia, Mr. Jacome was not listed, and in fact, you mentioned him as a potential rebuttal witness depending on what else transpired during the trial. [¶] And so I told Mr. Robertson that I was going to have this conference with him to give a very brief explanation as to why he was not going to call Mr. Jacome, and I'm giving him the opportunity to do that, because I think it is an important issue and I did want to have something on the record. [¶] And this portion of the transcript that takes place in chambers, I'll be ordering sealed—or order it sealed now and it would not be transcribed until further order of the Court."

The court invited Mr. Robertson to comment. Mr. Robertson explained, "Part of my concern and my tactical decision not to call Jacome relates to the fact that I have no idea what Mr. Gillan's going to do. He made statements himself a week, week and a half ago that if my client's going down, everybody's going down. His client ostensibly made

64

the statements that if he's going down, everybody's going down. [¶] My client had no contact with Mr. Estrada under anybody's theory and there's no indication of it. But I have no idea of what Lucio would say or—what he would or would not say or what he would blurt out up there. [¶] And further . . . don't know what Mr. Gillan's doing in terms of a defense, because I find myself having to call witnesses that would logically flow, and in my opinion, he should have called or planned on calling for his client, like, he made this statement to the jury that Lucio Estrada came upon a murder that had already happened, and yet the police reports are literally full of witnesses who see other people running away from the scene. [¶] And if you recall, I'm the only one who talked about other routes. I'm the only one who's bringing up these other people. So I don't understand what he would say. [¶] But I have some information that there may have been more than one vehicle there. That there was, in fact, drug trafficking going on between Southern California and Northern California. And that Daniel was involved in it. [¶] I can't prove this. And the Court has seen my efforts to try and get any information from law enforcement that would show that Miguel or Daniel or Lucio or Jacome were connected to drug dealing and/or a drug debt collection. [¶] So part of my reason behind not calling Jacome is that if I call him to talk about those limited statements and what was said, I don't know that Mr. Rosen won't, at that point, then try to bring out the statements that Estrada made to Jacome about seeing the blood splattering. He made statements that it wasn't like it was in the movie. Estrada completely incriminated himself to Jacome, if Jacome's believed, which—and I had a conversation with Mr. Gillan, and a—couple of times and he indicated that calling Jacome would be devastating to his case. [¶] I've never had a case where I was confronted with someone who's acting as Mr. Gillan did. And he did indicate that part of the reason for his levity and poking fun at me and making jokes, which I find completely inappropriate, is that he is trying to create a situation for his client where he can sort of joke about the cops just got the right guy. [¶] . . . So I think . . . Mr. Gillan's conduct has been problematic for me already. And having . . .

65

made those statements, his client will get up and testify and he'll sink everybody, it's kind of like that poison pill or loaded bomb. I don't know . . . what might be lurking there and I don't want to open that door at this time. [¶] You know, Gillan made the statement that he's not going to have any case. He's not going to call any witnesses except for that veiled threat of, in rebuttal, which means that he would put Lucio on. Now I don't know that he could tactically or technically do that, but my hope is that he'll be able to follow the evidence that I laid out about other people being there and run with that. [¶] I don't know what he's going to do. And I did not know before the trial what his conduct was going to be like. I didn't know. I've never seen anything like it."

The court acknowledged that the purpose of the in-chambers conference was to ascertain whether Mr. Robertson had thought through his decision not to call Jacome. The court told Mr. Robertson that the court was "satisfied that what you've told me, as I fully expected, is that you are making a reasoned, tactical decision. There's good logic behind your decision not to call Mr. Jacome, and so I'm happy with that, Okay."

In addition to Jacome's testimony, Garcia's counsel was aware that in May 2009, his investigator, Anne Fields, had interviewed Eric Hernandez. Hernandez had been housed at the county jail in the same pod as Estrada. Fields reported that Hernandez had told her about conversations that he had had with Estrada. Her report notes the following: "Lucio Estrada said that the hit on Mark Achilli was over money owed for drugs. Lucio said that drugs were being moved through the bar. Lucio said he was connected with the Mexican Mafia in Southern California. Lucio said that the Mexican Mafia wanted Mark dead. Lucio told Eric that the police have the reason for the homicide 'all wrong.' Lucio said that one guy working at the bar was family and he knew what was going on. [¶] Lucio made these statements in front of Eric Hernandez and Chad Reger. Mr. Reger is in prison serving a 15 to Life sentence for murder."

66

Garcia questions why Jacome and Hernandez were not called to testify during the presentation of his defense. Garcia argues that the need for their testimony was "readily apparent."

A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland*, *supra*, 466 U.S. at p. 689.) We reiterate that scrutiny of counsel's actions is highly deferential, undertaken with the view to removing the distorting effects of hindsight, and viewed as of the time that counsel was required to act. (*Id*. at pp. 689-690.) The challenger's burden is to show that counsel made "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Id*. at p. 687.)

As the United States Supreme Court has explained, " 'Surmounting *Strickland*'s high bar is never an easy task.' [Citation.] An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.] Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' [Citations.] The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. [Citation.]" (*Harrington v*. *Richter* (2011) 562 U.S. 86, 131.)

The failure to present specific evidence or witnesses, ask certain questions in direct or cross-examination, and make certain objections to evidence are traditionally

67

deemed to fall within the realm of trial tactics over which the court will not engage in "judicial hindsight." (*People v. Beagle* (1972) 6 Cal.3d 441, 458, superseded by statute on other grounds as stated in *People v. Rogers* (1985) 173 Cal.App.3d 205, 208-209.)

The problem with Garcia's argument that his counsel should have called Jacome and Hernandez is that we do not know if they would have testified favorably or unfavorably to Garcia. Garcia's claim of incompetence is based entirely on a speculative, hopeful view of possible evidence. Further, had Jacome testified consistent with his preliminary hearing testimony, he would have been subject to impeachment and rebuttal evidence.[28] Jacome's statements to the police and his preliminary hearing testimony attempted to minimize his involvement in the murder; he had a strong motive to fabricate his story that this was a mission to collect a drug debt. He denied any knowledge of a planned execution and "believed [that] Lucio was only going to 'wave his gun around' " to collect a debt for a large amount of cocaine. Jacome's sole source of information before the murder allegedly came from Estrada. Jacome had no independent knowledge that this was in fact related to the collection of a drug debt and we have serious doubts that this evidence was admissible as an admission by Estrada if elicited by Garcia.[29]

---

[28]     As the prosecutor argued in rebuttal,"[w]e had a lot of discussion here about a drug hit. It's pure speculation. It's fantasy. There's no evidence of drug dealing at Mountain Charley's, of drugs going in and out, of Mark Achilli owing people money for drugs. Nothing. Defense counsel said, 'Oh, it was common knowledge that Mark Achilli, you know, was addicted to cocaine.' No. No. The testimony was a few people testified that, 'Yeah, I knew Mark Achilli used cocaine recreationally.' [¶] Okay. Now, remember Mark Achilli doesn't own Mountain Charley's anymore or Club 180. He sells it to Paul Garcia in September of 2007. So how does—he has nothing to do with what's going on at Mountain Charley's or Club 180 after September 2007. So all this—its drugs, it's all speculation and fantasy. There's no drugs found in Mark Achilli's house. There's no large amounts of cash found. If it's a drug hit for money that's owed—his wallet's not taken. His wallet's in his back pocket. There's no evidence that this had anything to do with drugs."

[29]     A statement that was made other than by a witness while testifying and that is offered to prove the truth of the matter stated is hearsay. (§ 1200, subd. (a).) Generally, (continued)

68

More importantly, Garcia's counsel was aware that before trial he had sent a request to the prosecutor for information about whether Achilli or any of his business partners or employees had been involved in trafficking cocaine or money laundering. As the prosecutor explained to the court on the morning of September 3, 2010, Sergeant Frisby had used all the police resources available to him and determined that there was absolutely "no evidence of cocaine trafficking or money laundering associated with Mountain Charley's or Club 180. And the People . . . then wrote a letter to the defense indicating that." Garcia's counsel knew that if he attempted to elicit Jacome's testimony, the prosecutor had solid evidence in the form of Sergeant Frisby's testimony, which could have been elicited in rebuttal, that there was no evidence that Achilli was involved in drug dealing. Without corroborating evidence, Jacome's testimony had little significance.

Finally, Jacome's testimony was potentially detrimental to Garcia's defense. First, Daniel testified that Garcia suggested several times that the murder should look as if it was a drug deal gone wrong. Thus, the jury could have used Jacome's testimony to tie Garcia into the conspiracy that way.

Given the prospect that Estrada would take the stand and testify that Jacome was lying about what he had said, and in light of all the other knowledge that Garcia's counsel

hearsay is inadmissible. (*Id.*, subd. (b).) Here, Jacome's testimony that Estrada told him that they were on a mission to collect a drug debt would have been inadmissible because it was being offered to prove the truth of the matter asserted, i.e., that they were on a mission to collect a drug debt. Garcia suggests that it "was theoretically admissible as a party admission" under section 1220. However, section 1220 provides, "Evidence of a statement is not made inadmissible by the hearsay rule when offered *against the declarant* in an action to which he is a party . . . ." (Italics added.) See *People v. Dennis* (1998) 17 Cal.4th 468, 528 [the hearsay rule does not prevent evidence of a statement made by a party *from being admitted against that party*].) The testimony that Garcia proposes should have been elicited was not being offered against the declarant, i.e., against Estrada; it was being offered to support Garcia's defense.

had that there simply was no evidence that Achilli was involved in drug dealing, we cannot say that the decision by Mr. Robertson not to call Jacome and/or Hernandez amounted to incompetence under prevailing professional norms. It is well settled that strategic choices made by defense counsel after a thorough investigation of the law and facts relevant to the plausible options are "virtually unchallengeable." (*Strickland*, *supra*, 466 U.S. at p. 690.)

Garcia's citation to *Chambers v. Armontrout* (8th Cir. 1990) 907 F.2d 825 (*Armontrout*) does not persuade us otherwise. In *Armontrout*, the court found that trial counsel was incompetent because he failed to present "an unbiased, uncontradicted witness who provided evidentiary support to Chambers' only defense and whose damaging testimony was merely cumulative of several of the State's witnesses' testimony." (*Id*. at p. 831.) Here, Jacome was not an unbiased witness but a participant in a criminal enterprise, who, as noted *ante*, had a strong motive to fabricate his story about Estrada's purpose in coming to Los Gatos. His testimony did not eliminate Garcia as a participant; in fact, in some ways it bolstered Daniel's testimony that Garcia had told him to make sure that the murder looked as if it was a drug deal gone wrong; and his testimony was in conflict with the trial evidence in that there appeared to be no attempt to take Achilli's wallet or any attempt to take Achilli to a bank or ATM machine to get money.

Finally, as to Garcia's argument that Mr. Robertson had an obligation to call Hernandez as a defense witness, Mr. Robertson's declaration prepared for Garcia's new-trial motion indicates that both he and his investigator concluded that Hernandez was lying in an effort to curry favor with and/or spend more time with the investigator. Further, when they tried to re-interview him and confirm that he would be a witness, Hernandez would not return telephone calls. We cannot fault Mr. Robertson for not

70

presenting a witness whom he did not trust to present truthful testimony and who had demonstrated an unwillingness to come forward to testify.[30]

Garcia has failed to present any persuasive arguments to overcome the presumption that Mr. Robertson's decisions not to call Jacome and/or Hernandez to testify were sound trial strategies.

## II. *Ineffective Assistance of Counsel—Multiple Deficiencies*

Garcia contends that his counsel's failure to call readily available character witnesses, failure to present Gina Ronzano's testimony regarding his reaction to the news of Achilli's murder, failure to rebut Battiato's testimony regarding incriminating statements that he allegedly made on March 16, 2008, and failure to support his credibility with testimony regarding telephone calls between him and Daniel with readily available evidence and argument in "combination with each other" "were sufficiently prejudicial to constitute a claim of ineffective assistance of counsel."

We address each of these alleged failures in turn.

*Failure to Call Character Witnesses*

In his motion for a new trial, Garcia produced declarations from several witnesses who attested to his character for peacefulness and nonviolence. One of these declarations was from Father John Murphy, who had taught Garcia at Bellarmine and who had hired Garcia in 1999 as a football coach. According to Father Murphy, he had never seen Garcia threaten anyone or exhibit threatening behavior and had never seen him show signs of anger or violence, even when playing football; Father Murphy believed Garcia to be a peaceful and "conciliating" person, a role model for the boys. Father Murphy stated that he was "stunned" when he heard of the charges because they were "so absolutely incongruous" with who Garcia was. The declarations from other people who knew

---

[30]    When Mr. Robertson's investigator finally met Hernandez by chance, he confirmed that he would not take the stand and testify in a new trial.

Garcia were consistent—these people had never seen Garcia engage in violent or threatening behavior and all of them thought he was peaceful and was not the type of person who would have someone killed.

Garcia's trial counsel proffered an explanation for his decision not to call character witnesses.[31] Mr. Robertson explained that his failure to call character witnesses "was a deliberate and well considered decision. [¶] From conversations with Mr. Garcia, witnesses, and Mr. Garcia's family, and his friends, it was clear that we could call witnesses on all aspects of Mr. Garcia's character. [¶] From the same conversations and from a review of police reports it also became clear that calling character witnesses on behalf of Mr. Garcia would be very problematic. The case law is clear that once a Defendant puts his character trait at issue, the prosecution may offer rebuttal evidence and may impeach the witnesses. I had made a decision not to put character evidence on. I had anticipated that Mr. Rosen would be prepared to take on character evidence in such a way that would be extremely damaging to Mr. Garcia's image if he were allowed to do so. [¶] In fact, Mr. Rosen more than once, brought up during the trial that we were 'opening the door' to character evidence. [¶] Any witnesses on character evidence could be cross-examined regarding that witness's opinion. The issue in the case was not whether Mr. Garcia engaged in direct physical violence himself but whether or not he hired the murder of Mark Achilli. To that extent, if a witness such as Father John Murphy were called (and we considered members of the cloth), I expected and believed that there would be a number of issues raised. [¶] Mr. Rosen did not miss many steps during the trial. He may well have raised motions to limit the area of character evidence addressed. I also suspect that he may not have moved to limit proposed character

---

[31] Mr. Robertson submitted a declaration filed under seal in which he addressed each of the points raised in the new trial motion. In his declaration, he explained his reasoning for many of his actions or inactions at trial.

72

evidence, hoping the defense would open the door to impeachment of the witnesses. [¶] I recall a specific incident during the trial when a witness (I believe it was Ms. Ronzano), made a spontaneous positive comment about Mr. Garcia that could be considered as character evidence. Mr. Rosen stated that he felt that the door had been opened to character evidence. The comment was withdrawn on my motion. It was withdrawn after Mr. Rosen indicated that he felt the door had been or was being opened to allow the prosecution to introduce evidence to challenge Mr. Garcia's alleged good character. Mr. Rosen was clear at a bench discussion of his intentions to attack any character evidence that was offered. [¶] Evidence that Mr. Garcia was 'not the type of person who would arrange for someone to be killed' if offered at trial, not objected to by Mr. Rosen, or allowed over objection would have been a gold mine for cross examination. Of course, the idea that there is a 'type of person who would arrange for someone to be killed' is open to discussion[.] I assumed that any type of character evidence would have been addressed by 'have you heard' questions which would allow Mr. Rosen to impeach the witnesses. [¶] Part of the problem we faced with Mr. Garcia was that there was evidence available to the prosecution that Mr. Garcia was a habitual liar to the women in his life and to his employees as well. I have not reviewed the reports again but my recollection is that Mr. Garcia was claimed to have cheated a number of employees out of rightfully owed money for wages or services. [¶] The prosecution had interviewed a number of witnesses, virtually every employee he had contact with and others as well. The picture that emerged from the interviews of those witnesses portrayed Mr. Garcia as a person who had practiced a great deal of dishonesty in his dealings with employees. The picture painted of Mr. Garcia was not a nice one and I was not about to . . . let Mr. Rosen get a foot in the door to be able to address any character evidence we could offer." Thus, trial counsel's explanation indicates that he had a sound tactical reason for not calling character witnesses.

73

Garcia argues that his trial counsel did not notice that the claim advanced was the failure to call witnesses to attest to his character trait for peacefulness and nonviolence, not his character trait for honesty and veracity. He asserts that evidence of his dishonesty or have-you-heard allegations of dishonesty would simply not have been relevant impeachment or rebuttal.

However, as Mr. Robertson pointed out, the issue in the case was not whether Garcia engaged in direct physical violence himself such that evidence of his character trait for peacefulness and nonviolence would have been relevant, but whether he was the sort of person who would hire someone to murder Achilli. All it would have taken is for one witness to say "no, he's a really nice person" and the door would have been opened for the prosecution to bring in evidence that Garcia was not such a nice person. The strict boundaries between violence and honesty now drawn by Garcia are often blurred by comments made by witnesses while testifying.

As our Supreme Court has explained, "We have repeatedly said that '[t]he possibility of damaging rebuttal is a necessary consideration in counsel's decision whether to present mitigating evidence about the defendant's character and background.' [Citations.] 'Hence, a competent attorney . . . could prudently conclude that the risk of damaging rebuttal weighed against presentation of character and background in general.' [Citation.]" (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960.)

Counsel's ultimate decision not to *present* character evidence is constitutionally supportable. Counsel could properly assume from the police reports, and from subsequent direct assertions by the prosecutor, that introduction of mitigating character evidence had the potential of exposing his client to damaging revelations, a risk that on balance he was not prepared to take.

Thus, we must reject Garcia's claim of ineffective assistance of counsel in this instance.

*Failure to Call Ronzano*

Garcia asserts that trial counsel was incompetent for failing to elicit testimony from Ronzano regarding his reaction to the news of the murder. In her declaration attached to the new-trial motion, Ronzano asserted that after Garcia "learned of Mark Achille's [*sic*] murder, he was in shock, he stuttered and he could not get his words out in a cohesive sentence, as if he could not believe it." Trial counsel indicated that his concern with calling Ronzano was that she had information that could be damaging to the defense and she had made statements inconsistent with the declaration filed in the new trial motion. Counsel explained that Ronzano had "expressed that she was willing to lie to get [Garcia] off. She said, 'Tell me what to say and I will swear to it.' Perjury was not a tactic I would use as a line of Defense. Ronzano also expressed that she would see [Garcia] through the trial but that she 'was finished' with him." Furthermore, he had asked Ronzano in the presence of his investigator on more than one occasion if she thought that Garcia was responsible for the murder. Ronzano stated that she believed Garcia could have been involved; when pressed she stated that she thought that he could have done it. Her statement about whether Garcia was capable of what he was accused of never wavered.

Trial counsel pointed out that Ronzano would be subject to cross-examination regarding Garcia's purported reaction to the news of Achilli's death because Garcia did not express emotion to the police or his employees.

Again, counsel made it quite apparent that he had sound tactical reasons for not calling Ronzano.

With respect to these aforementioned supposed failures of trial counsel, Garcia has not convinced this court that there is a proper way this court could reverse his conviction with respect to the kind of tactical decisions that were made without running afoul of the commandments of *Strickland* and *Ledesma* against just that sort of second-guessing.

75

*Failure to Rebut Battiato's Testimony*

Garcia asserts that trial counsel was incompetent for failing to elicit testimony from Lezotte that a statement that Battiato made was untrue. Battiato testified that on Sunday, March 16, 2008, he went to the house of Garcia's mother to pick up four tickets to CB Hannigan's Saint Patrick's Day celebration. According to Battiato, Lezotte was there at the time. Garcia told Battiato not to tell the police that he had driven by Achilli's residence. When cross-examined by Garcia's counsel, Battiato said that Garcia made two statements; one statement was that Battiato should not talk to the police unless Lezotte was present and the second statement was that Battiato should not tell the police that he had driven by Achilli's residence. According to Battiato, Lezotte was there for the first statement, but not the second.

Garcia points out that Mr. Robertson failed to elicit from Lezotte the fact that he had no memory of Battiato being at the house on that particular day and at no time did he tell Garcia or anyone else that Battiato should not talk to the police unless he was present. When interviewed by the police, Lezotte had told them that he had read in police reports what Battiato had said and he had no knowledge of the events as described by Battiato; and it was "categorically untrue" that he told Garcia or Garcia told Battiato not to talk to the police without him being present. Garcia argues that this testimony would have "seriously impeached Battiato's specific claim and would have added to the weight of impeachment of Battiato overall." Garcia contends that there is no conceivably reasonable tactical ground not to have elicited the rebuttal evidence in question.

We reiterate that to prevail on an ineffective assistance of counsel claim, Garcia must establish two things: (1) the performance of his or her counsel fell below an objective standard of reasonableness, and (2) prejudice occurred as a result. (*Strickland*, *supra*, 466 U.S. at p. 687; *People v. Hernandez* (2012) 53 Cal.4th 1095, 1105.) The *Strickland* court explained prejudice as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

(*Strickland*, *supra*, at p. 694.)  Further, the high court stated "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. (*Ibid*.)

In this instance, we consider *Strickland's* second prong; we assume for the sake of argument that counsel's performance fell below an objective standard of reasonableness. We answer the question posed by that prong—whether there was a reasonable probability of a different outcome had the error not occurred—in the negative.  Even if Lezotte had testified consistently with what he had told the police, this testimony was insignificant to the defense.  The jury could have concluded that Lezotte might not have been within hearing distance of the conversation between Garcia and Battiato, or that Battiato was simply incorrect in remembering that Lezotte was there.  The potential benefit of eliciting testimony that contradicted Battiato on a minor collateral matter would not have altered the outcome of the trial.  Any error in trial counsel's omission was harmless.

*Failure to Support Garcia's Credibility Regarding the Telephone Calls between Him and Daniel*

Garcia asserts that the prosecutor thought it was significant and told the jury during his opening statement that there were 37 telephone calls between him and Daniel in the two weeks between March 1 and March 14.  When Daniel was asked about the telephone calls, he had no independent recollection of the number of calls, but agreed to whatever the prosecutor asserted the records showed.  Sergeant Frisby, who had reviewed both Garcia's Verizon bill and Daniel's Sprint bill for the time period, made a diagram showing 37 telephone calls; the diagram was admitted into evidence as exhibit No. 44.

Garcia points out that he testified that Daniel, as part of his job at Pacific Blue Equity, was in charge of fielding the telephone calls that came in from the advertisements that Pacific Blue Equity was running on a Spanish language radio show broadcast by Salvador Lara.  According to Garcia, he would telephone Daniel throughout the week to find out what telephone calls came from the commercials and to find out whether Daniel

77

had followed up on them. On cross-examination by the prosecutor, he disagreed with the number of telephone calls between him and Daniel; he pointed out to the prosecutor that Sergeant Frisby had double-counted calls. Then, on redirect, Mr. Robertson elicited from him that he had prepared his own chart based on the telephone bills, and there were only 23 telephone calls, some of which were not connected and some which had gone to voicemail.

During his closing argument, Mr. Robertson brought up the issue of the Garcia-Daniel telephone calls and told the jury that if the number of calls was important to them, they should "go look at the phone records" because his client was being "impugned" and he "had [his] hands full." Further, he did not "spend the ten hours looking at them." During his final argument, the prosecutor asked the jury, "If this is about Salvador Lara and these real estate leads . . . why didn't we hear from Salvador Lara in this trial? Why? Defense has the subpoena power of the Court. They can call Salvador Lara and we can hear [what] Salvador has to say."

Garcia argues that Mr. Robertson's failure to elicit testimony from Daniel that as part of his job at Pacific Blue Equity he fielded the telephone calls that came in from the Spanish language radio station and the failure to have Salvador Lara testify about the commercials he ran promoting Pacific Blue Equity amounted to ineffective assistance of counsel.[32]

In this instance, we consider *Strickland*'s first prong—whether counsel's performance fell below an objective standard of reasonableness. Even if Daniel had confirmed that he fielded the Spanish language calls that came in from the radio advertising and Mr. Robertson had Lara confirm that he had an ongoing relationship with

---

[32]    Attached to the new-trial motion was a declaration signed by Lara in which he confirmed that he had an ongoing business relationship with Garcia and that during each of his one-hour radio shows he ran commercials promoting Pacific Blue Equity; and the radio spots continued to run through March 2008.

Garcia from October 2007 through March of 2008 and ran the radio advertisements, Lara would have had to testify that there were numerous telephone calls that came in as a result of the commercials between March 1 and March 14 that Daniel received in order to have generated the volume of telephone calls between Daniel and Garcia. Garcia offers no proof that Lara could or would have provided that information. Again, Garcia's ineffective assistance of counsel claim is based on a speculative, hopeful view of possible evidence. Even if Lara had been called to testify consistent with his posttrial declaration, it would have added nothing to Garcia's credibility on the subject matter of the telephone calls. Lara did not know what the substance of the telephone calls was between Garcia and Daniel; and Daniel could easily have been recalled by the prosecution to testify that the telephone calls that occurred between him and Garcia in the weeks leading up to the murder had nothing to do with the Spanish language commercials. Mr. Robertson could reasonably have concluded that it was not worth exploring this line of questioning because to do so might inadvertently have complicated Garcia's defense and created more problems than it solved. Garcia has not demonstrated that Mr. Robertson was deficient in not eliciting this testimony from Daniel and Lara.

Garcia claims that the combined prejudice from all trial counsel's failures is sufficient to undermine confidence in the outcome of this case. Garcia attempts to reweigh and reevaluate the evidence. He argues that the prosecution's lead witness in this case (Daniel) was an accomplice, guilty of first-degree special circumstance murder, who would not have testified if the prosecution had not allowed him to plead guilty to voluntary manslaughter for a term of 12 years. The prosecution's secondary witness (Battiato) was a man of unstable perceptions, strong biases against him, and questionable credibility. The corroborating circumstantial evidence was there, but it was hardly dispositive or overwhelming.

" 'In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a

reasonable doubt might have been established if counsel acted differently. [Citations.] Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. [Citation.] This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." [Citation.] The likelihood of a different result must be substantial, not just conceivable. [Citation.]' [Citation.]" (*People v. Jacobs* (2013) 220 Cal.App.4th 67, 75.)

Assuming for the sake of argument that Mr. Robertson's representation fell below an objective standard of reasonableness, and trial counsel should have elicited Jacome's and/or Hernandez's testimony, should have introduced character evidence, should have elicited from Lezotte that he did not tell Battiato or Garcia not to talk to the police without him being present, should have elicited Ronzano's testimony of Garcia's reaction to the news of Achilli's death, and should have had Lara testify that he ran the commercials for Pacific Blue Equity on the radio, we see no reasonable probability that the result of the trial would have been different. The direct and circumstantial evidence of Garcia's guilt was too great.

Daniel's testimony, corroborated by statements from his cousin Miguel, and by the circumstantial evidence supplied by the forensic accounting records, computer records and telephone records, showed that Garcia solicited and paid for Achilli's murder because he was obsessed with Donnelly—always checking on her whereabouts and telephoning her or sending her text messages demanding to know where she was and telling her she needed to choose between him and Achilli.

Garcia appears to contend that Daniel had a reason to lie about his involvement, i.e., he was granted a plea deal for his testimony. However, when Daniel finally told the police of Garcia's involvement in the case, which was consistent with his trial testimony, he was facing a first degree murder charge as an accomplice and no plea bargain was offered until months

80

later; thus, he had no reason to make up the story that Garcia asked him to find someone to kill Achilli.

In sum, any assumed errors were harmless.

Finally, Garcia argues that if this court deems the record on appeal inadequate to resolve his ineffective assistance of counsel claims, the trial court abused its discretion in denying counsel's request for an evidentiary hearing to assess the credibility and significance of former trial counsel's allegations and assertions in his 60-page declaration.

First, we find the record on appeal adequate to resolve his ineffective assistance of counsel claims. Second, "there is simply no authority for the proposition that a trial court necessarily abuses its discretion, in a motion proceeding, by resolving evidentiary conflicts without hearing live testimony." (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 414.) "California law affords numerous examples of a trial court's authority, in ruling upon motions, to resolve evidentiary disputes without resorting to live testimony." (*People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 201, and authority cited therein.)

In essence, Garcia contends that a hearing was necessary to resolve material disputed issues of fact and to allow him the opportunity to establish that he was prejudiced by counsel's numerous alleged failures. He concludes that the denial of an evidentiary hearing violated his right to due process. Garcia cites no case law *requiring* a trial court to hold an evidentiary hearing when a new trial motion is based on ineffective assistance of counsel; we acknowledge, however, that a trial court has the discretion to hold such a hearing when the new trial is sought on the grounds of jury misconduct. (See, e.g., *People v. Hedgecock* (1990) 51 Cal.3d 395, 415.) Further, there is support in *People v. Dennis* (1986) 177 Cal.App.3d 863, for the proposition that where claims of

81

ineffective assistance of counsel may not be resolved on the record before the court, the court may hold an evidentiary hearing. (*Id*. at p. 872.)[33]

We agree that the trial court had the discretion in this case, but we conclude that the court did not abuse its discretion. *People v*. *Williams*, *supra*, 16 Cal.4th 635 is instructive on this point. In *People v*. *Williams*, the defendant moved for a new trial, alleging jury misconduct and presenting the declarations of three jurors who stated that the jury never reached a verdict on the murder charges even though there were signed verdict forms. (*Id*. at p. 685.) The trial court did not find the declarations credible and denied the motion without holding an evidentiary hearing. (*Id*. at pp. 685-686.) The California Supreme Court found no "manifest and unmistakable abuse of discretion." (*Id*. at p. 686.) The court stated that the trial court could resolve any disputed factual issue without the need for an evidentiary hearing. (*Ibid*.) The same is true in the instant case and is even more evident. The trial court had heard all the evidence during trial and had had the opportunity to observe trial counsel and Garcia in the courtroom. The new-trial motion had many exhibits in support of Garcia's claim of ineffective assistance of counsel.[34] Garcia's former counsel filed a 60-page declaration explaining his actions, which the court read. Thus, the material facts in this case were adequately explained by the voluminous information before the court, combined with its own observations.

---

[33] In *People v*. *Pope* (1979) 23 Cal.3d 412 (overruled on another ground as stated in *People v*. *Ortiz* (2012) 208 Cal.App.4th 1354, 1372), the case upon which the *Dennis* court relied, the Supreme Court was talking about an evidentiary hearing in the context of a motion for writ of habeas corpus. In *People v*. *Pope*, the California Supreme Court stated that "[w]here the record does not illuminate the basis for the challenged acts or omissions, a claim of ineffective assistance is more appropriately made in a petition for habeas corpus. In habeas corpus proceedings, there is an opportunity in an evidentiary hearing to have trial counsel fully describe his or her reasons for acting or failing to act in the manner complained of." (*People v*. *Pope*, *supra*, at p. 426.)

[34] The motion, plus exhibits filed on December 22, 2011, takes up approximately one and one-half volumes of the clerk's transcript and extends close to 400 pages.

The matter was fully capable of being resolved on the record, and no evidentiary hearing was necessary. Given the great degree of latitude accorded the trial court in these matters, there was no abuse of discretion. (*Ibid.*; *People v. Dennis*, *supra*, 177 Cal.App.3d at p. 873 [a defendant seeking a new trial must establish, by affidavit, oral testimony, *or* reference to the trial record, that his trial counsel was ineffective in some manner and that counsel's ineffectiveness prejudiced him].)

III. *Trial Court's Refusal to Give a Limiting Instruction Regarding Miguel's Confession*

As noted *ante*, Miguel's confession, which contained no reference to Garcia, was presented to the jury through the testimony of Sergeant Frisby. Garcia's counsel requested that the court give a limiting instruction to the effect that Miguel's confession was not admissible against Garcia. The court denied the request.

Garcia argues that his rights under the Sixth and Fourteenth Amendments were violated by the trial court's refusal to give a limiting instruction on Miguel's confession. He concedes, however, that Miguel's confession contained no reference to him.

Even if we were to assume for the sake of argument that the trial court erred in refusing to give a limiting instruction along the lines that Garcia's counsel requested, we would find the assumed error harmless beyond a reasonable doubt. Contrary to Garcia's argument, Miguel's confession was not admitted against Garcia and the prosecution did not invite the jury to use Miguel's confession to unconstitutionally buttress Daniel's testimony for purposes of proof beyond a reasonable doubt. Miguel's redacted statements did not refer to Garcia either directly or indirectly, or by implication. In fact, it made no mention of anyone other than Daniel being involved in the plot to have someone killed. It was uncontested that Miguel never knew Garcia's identity or even that he existed. While Garcia argues that Miguel's testimony corroborated Daniel's testimony, it did so only as to the dealings between them rather than anything that occurred between Daniel and Garcia. No evidence adduced at trial linked Garcia directly to Miguel.

83

Finally, we note the evidence detailing Garcia's obsession with Donnelly was overwhelming, as was the evidence of Garcia's frustration that Donnelly had renewed her relationship with Achilli. Daniel's testimony regarding Garcia's request to have Achilli murdered was confirmed by the forensic accounting. Thus, the evidence of Garcia's role in the murder was amply demonstrated by other evidence. Miguel's confession spoke only to the mechanics of the murder, something that Garcia was not involved in. Miguel's confession did not implicate Garcia as the person who had requested and financed the murder; and Miguel's confession was unimportant in relation to all the other evidence linking Garcia to the murder. Any assumed error in failing to give a limiting instruction that Miguel's confession could only be used against Miguel was harmless beyond a reasonable doubt.

## *Disposition*

The judgments are affirmed.

_____

ELIA, J.

WE CONCUR:

_____

RUSHING, P. J.

_____

PREMO, J.